16463

ARCHAMBAULT ET AL. v. SPROUSE

(63 S. E. (2d) 459)

*Messrs. M. Martin Davis* and *I. H. Jacobson,* of Charleston, *for Appellant,*

*Messrs. Sinkler, Gibbs & Simons,* of Charleston, *for Respondents,*

February 7, 1951.

OXNER, Justice.

This is a suit in equity to enjoin appellant, defendant below, from proceeding with the erection of what is termed a two story garage apartment upon the rear of his lot, it being contended that said structure violates certain restrictive covenants applicable to a subdivision known as Palmetto Gardens located in North Charleston, South Carolina, and to require appellant to remove so much of said building as violates said restrictions. The cause was referred to the Master for Charleston County, who after holding a number of references and taking a vast amount of testimony, recommended that the relief sought in the complaint be granted. His report was confirmed by the Circuit Court and this appeal followed.

During 1940 and 1941, the Defense Homes Corporation, a Federal housing agency, erected in said subdivision approximately 250 houses which were rented to war workers. At the conclusion of the war emergency, said corporation proceeded to sell said houses and by 1946, the entire subdivision was owned by individuals. The Master, who visited the premises, found that "all of these homes are of permanent and substantial character and the subdivision may properly be called a high class residential section, being one of the finest in the Charleston area." All of said lots were sold subject to the following conditions and restrictions which were duly recorded in the R. M. C. Office for Charleston County on June 25, 1941:

"A. All lots in the tract shall be known and described as residential lots. No structures shall be erected, altered, placed,

or permitted to remain on any residential building plot other than one detached single-family dwelling not to exceed two and one-half stories in height·and a private garage for not more than two cars and storage. Buildings incidental to residential use may be erected.

"B. No building shall be located nearer to the front lot line or nearer to the side street line than the building setback lines shown on the recorded plat. In any event, no building shall be located on any residential building lot nearer than 20 feet to the front lot line, nor nearer than 10 feet to any side street line. No building, except a detached garage or other outbuilding located on rear one-fourth of lot, shall be located nearer than five feet to any side lot line. On corner lots garage shall be placed against inside lot line.

"C. No residential structure shall be erected or placed on any building plot,·which has an area of less than 5000 square feet or a width of less than 50 feet at the front building setback line.

"D. No noxious or offensive trade or activity shall be carried on upon any lot, nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood.

"E. No trailer, basement, tent, shack, garage, barn or other outbuilding erected in the tract shall at any time be used as a residence temporarily or permanently, nor shall any structure of a temporary character be used as a residence.‚

"F. No dwelling costing less than $3,000.00 shall be permitted on any lot in the tract. The ground floor area of the main structure, exclusive of one-story open porches and garages, shall be not less than 650 square feet in the case of a one-story structure, nor less than 500 square feet in the case of a one and one-half, two or two and one-half story structure.

"G. A five foot (5′) easement on the back line of each lot and a two foot six inch (2′ 6″) easement on each side line

of each lot is reserved for use of poles, wires, sewers, and other public utilities.

"H. No persons of any race other than the Caucasian race shall use or occupy any building of any lot except that this covenant shall not prevent occupancy by domestic servants of a different race domiciled with owner or tenant."

Appellant and respondents are property owners in said subdivision. Appellant purchased his home in 1946, at a cost of $4,450.00. There are five rooms, including two bedrooms, and a bath in his house, which is occupied by himself, his wife and mother-in-law. During the fall of 1948, he commenced construction of a two story combined dwelling and garage upon the rear of his lot. The plans called for a two car garage, a large utility room and a stairwell on the first floor, and for a kitchen, bathroom, two bedrooms with closets, a living room and an enclosed porch on the second floor. The Master found that this structure was "clearly intended to be an entirely independent and sulf-sufficient living unit complete with all facilities and not in any way dependent on the original building at the front of the lot." Appellant testified that the house in which he lived was inadequate for his needs; that he desired additional space to accomodate relatives who visited him; and that he had no present intention of using the second floor of the new structure for servants' quarters or of renting it to strangers. However, there was other testimony to the effect that appellant had stated that he "intended to live in it himself and rent his house." Appellant says that he has expended approximately $4,200.00 on this building, which he contends is now 85% complete, and that it would require about $750.00 additional to finish it.

Respondents commenced this action on March 1, 1949. They alleged that the structure being erected violated restrictions A, E, and F heretofore set out. Appellant denied the material allegations of the complaint, alleged that the restrictions permitted the construction of a garage apartment, and set up the following affirmative defenses: (1) That at

a meeting of the Palmetto Gardens Civic Club held on February 8, 1949, attended by respondents, a resolution was passed waiving all current violations of the restrictive covenants and that respondents were bound by this resolution. (2) That numerous property owners in Palmetto Gardens, including respondents or some of them, had heretofore and were now violating certain of these restrictions and by reason thereof were estopped to assert the infractions set forth in the complaint. (3) That a building permit for this garage apartment was issued in October, 1948, and that the respondents were guilty of laches in taking no action to prevent the erection of this structure until after appellant had expended large sums of money.

Within due time respondents moved to strike the affirmative defenses from the answer upon the ground that none of them constituted a defense to the cause of action set forth in the complaint. The Circuit Court granted this motion. On appeal we held that they were improperly stricken and the order of the Circuit Court was reversed. *Archambault v. Sprouse,* 215 S. C. 336, 55 S. E. (2d) 70, 72. It was there stated: "All of the issues presented by the appeal involve the defenses of waiver, laches, estoppel and acquiescence under various and diverse circumstances, which it seems to us can best be determined by a trial on the merits. It might be that a strict construction of defendant's affirmative defenses, under the applicable rules of law, would be adverse to him, but we are not disposed at this stage of the case to define and determine the rights of the parties merely on the pleadings."

We shall first determine whether there has been a violation of any of the restrictive covenants. The Master held that the structure now being erected violated restrictions A and E. Having reached this conclusion, he considered it unnecessary to determine whether there was a violation of restriction F. We are in accord with this view. The structures permitted on a lot in this subdivision are clearly limited by restriction A to "one detached single fam-

ily dwelling", not exceeding a certain height, "a private garage for not more than two cars and storage", and "buildings incidental" to the use of such residence. Appellant contends that the structure in controversy may be properly classified as one "incidental to residential use". We do not think so. The word "incidental" is defined in Black's Law Dictionary, Third Edition, as follows: "Depending upon or appertaining to something else as primary; something necessary, appertaining to, or depending upon another which is termed the principal; something incidental to the main purpose." Undoubtedly this was the meaning contemplated in the restriction under consideration. Clearly the apartment on the second floor of this structure, a complete living unit having substantially the same accommodations as the main structure, cannot be said to be incidental to the use of appellant's residence. It was manifestly intended that only one dwelling house should be placed on each lot. This conclusion is fortified by restriction E which provides that no garage or other outbuilding erected on the lot "shall at any time be used as a residence temporarily or permanently, nor shall any structure of a temporary character be used as a residence."

Appellant argued that the meanings of restrictions A and E are rendered doubtful by restriction H and that such doubt should be resolved in favor of the free use of the property and against restriction. We do not think restriction H has that effect. It relates solely to the class of persons who may reside in this subdivision. It was intended to restrict the subdivision to those of the Caucasian race. However, the servants of property owners or their tenants, regardless of race, are permitted to reside on the premises. Assuming, without deciding, that it would be permissible for an owner to provide servants' quarters over his garage, it is obvious that the second floor of the structure under consideration was not constructed for that purpose.

Our attention is called to the rule that restrictions of this character are to be construed most strictly against the grantor and persons seeking to enforce

them and any substantial doubt or ambiguity must be resolved in favor of unrestricted use of the property. But, as pointed out in *Sprouse v. Winston,* 212 S. C. 176, 46 S. E. (2d) 874, this rule has no application where, as here, there is no ambiguity and the meaning of the parties has been clearly expressed.

We now turn to appellant's affirmative defenses which ■ raise issues of waiver, laches and estoppel. These are largely factual questions which must be considered in the light of the well settled rule that in an equity case findings of fact by a master or a referee, concurred in by a circuit judge, will not be disturbed by this Court unless it appears that such findings are without evidentiary support or are against the clear preponderance of the evidence. *Epworth Orphanage v. Long,* 207 S. C. 384, 36 S. E. (2d) 37; *Samuel v. Young,* 214 S. C. 91, 51 S. E. (2d) 367; *Wolfe v. Wolfe,* 215 S. C. 530, 56 S. E. (2d) 343; *Phipps v. Phipps,* 216 S. C. 248, 57 S. E. (2d) 417.

There is no hard or fast rule as to what constitutes ■ laches. In stating the law applicable to this issue, we said on the first appeal of this case, 215 S. C. 336, 55 S. E. (2d) 70, 11 A. L. R. (2d) 388 : "If there has been unreasonable delay in asserting claims, or if, knowing his rights, a party does not seasonably avail himself of means at hand for their enforcement, but suffers his adversary to incur expense or enter into obligations or otherwise change his position, or in any way by inaction lulls suspicion of his demands to the harm of the other, or, if there has been actual or passive acquiescence in the performance of the act complained of, then equity will ordinarily refuse her aid for the establishment of an admitted right, especially if an injunction is asked. * * * Diligence is an essential prerequisite to equitable relief of this nature. * * * But so long as there is no knowledge of the wrong committed and no refusal to embrace opportunity to ascertain facts, there can be no laches. * * *

"On the other hand, one who openly defies known rights, in the absence of anything to mislead him or to indicate assent or abandonment of intent to oppose on the part of others, is not in a position to urge as a bar failure to take the most instant conceivable resort to the courts."

We shall now endeavor to apply the foregoing principles to the facts of this case. It is undisputed that appellant was thoroughly familiar with the restrictions on this property. Indeed, he boasted that he "could come nearer repeating them" than any of the other residents. Several years prior to the institution of this action, he brought a suit for the purpose of requiring one of his neighbors to remove a garage which had been erected on a location which he contended violated restriction B. This Court held that he was entitled to the relief sought. *Sprouse v. Winston, supra,* 212 S. C. 176, 46 S. E. (2d) 874.

Appellant says that construction of this building was commenced about the middle of September, 1948. A building permit was issued on October 13th which appeared in the local paper on November 27th, but was not seen by any of the respondents. While appellant testified that by November the work had progressed beyond the first story, none of the respondents at that time had any knowledge of the intended use of this structure. One of them testified that he first learned that the second story was to be used as an apartment about Christmas but took no immediate action because he thought a matter of that kind was handled by some state or county agency. The other respondents did not acquire this information until some time in January, 1949. Soon thereafter a discussion arose among some of the residents as to what action should be taken. During the latter part of January, a committee called on appellant who insisted that he was not violating the building restrictions. On January 31, 1949, counsel employed by a group of these residents advised appellant by letter that an apartment on the second floor would constitute a violation of the restrictive covenants and

that the necessary steps would be taken to restrain any such violation. Shortly thereafter a notice was mailed to all property owners in this subdivision of a meeting to be held on February 8th for the purpose of discussing the building restrictions. This meeting was attended by about 150 residents including most, if not all, of the respondents. One of those who had been most active in leading the movement to enforce the building restrictions advised that no action be taken against appellant. A motion was made and carried that all past violations of the restrictions be considered "closed issues" but that immediate steps be taken to prevent any future violations. Respondents said they were so astonished at this change of viewpoint on the part of several who had previously been such staunch advocates of enforcement of the restrictions that they refrained from voting. A day or two later respondents formed another group for the purpose of enforcing compliance with the restrictions. This group took the matter up with the same firm of attorneys previously consulted and who had written the letter of January 31, 1949. On February 15th these attorneys advised appellant by letter that while the group of property owners by whom they were formerly retained had decided not to press the matter, they had now been employed by a different group who intended to restrain him from violating the restrictions. This action was thereafter commenced on March 1, 1949. On March 8th a meeting was held of the Palmetto Gardens Civic Club, an unincorporated association, which was attended by about 75 members. The club voted overwhelmingly in favor of assisting in the prosecution of the action which had been commenced.

Throughout this controversy the position of appellant has been that the erection of this structure did not constitute a violation of the restrictive covenants. One of the witnesses testified that about Christmas of 1948, while being shown through the building, he suggested to appellant that the use of the second floor as an apartment might constitute a violation of the restrictions, to which appellant replied: "The

covenants are not worth a damn, you can do anything you want to. * * * I have my building permit and talked it over with my neighbors next door and the framing is up and if anybody wants to complain it will not do them any good." Even after appellant was advised of impending litigation by the letter of January 31, 1949, he continued with the construction and admitted that more work was done on the building in February than during the preceding December or January.

We think the foregoing evidence is entirely sufficient to sustain the conclusion of the Master, concurred in in by the Circuit Court, that respondents did not acquiesce in appellant's violation of the building restrictions nor do anything reasonably calculated to cause him to think that they would not be enforced, and that respondents acted with reasonable promptness. It cannot be said as a matter of law that respondents should have known of the intended violation during November or the early part of December, 1948. It was not incumbent upon them to busy themselves with an inspection of the building or to watch the construction in the anticipation that appellant was planning to violate the resrictive covenants. *Loudenslager v. Pacific Improvement Co.,* 93 N. J. Eq. 218, 115 A. 752. They had a right to assume that appellant, who had two years previously brought suit to force his neighbor to comply with the restrictions, would not himself commit an infraction. The fact that a two-story building was being erected on the rear of appellant's lot did not necessarily show a violation of the restrictions. It is the construction of an apartment on the second floor which constitutes the violation and this fact was not known to respondents until the latter part of December or January. It may be reasonably inferred under all the circumstances that after acquiring such knowledge, respondents acted with reasonable diligence. We do not have a situation, as appeared in several of the cases cited by appellant, where the violation was of such character that it should have been observed by any passerby. We also have the further consideration that

appellant proceeded deliberately. He was adamant in the position that he had a right to erect the structure. He assumed the risk that his interpretation of the covenants might be incorrect.

We next consider the effect of the resolution passed at the meeting held on February 8, 1949, to which all residents of Palmetto Gardens were invited. As pointed out in the first appeal of this case, this meeting had no "official status." It was not within the power of the majority to conclude the rights of all those present. They could not legally bar the minority from proceeding to enforce compliance with the restrictive covenants. It is true that appellant may have been led to believe by the adoption of this resolution that the property owners in this subdivision intended to waive any violation caused by the erection of this structure and that he could proceed with the work, but any such belief must have been dispelled one week later when he received a letter from the attorneys employed by respondents to the effect that proper action would be taken to enforce compliance with the restrictions. During this interim of one week, appellant could not have incurred much expense.

Finally, it is contended that any right of respondents to injunctive relief is barred by their own violations of some of the restrictive covenants. We find no evidence of such violations. Indeed, there has been remarkable success in maintaining the standard set out in these restrictions and preserving the general building scheme. But assuming that the acts complained of are sufficient to constitute a violation of some of the restrictions, they are of a minor nature and not of such character as to affect the value or enjoyment of other property in the subdivision. On the previous appeal in this case, 215 S. C. 336, 55 S. E. (2d) 70, we said: "The general rule should likewise be stated that the violation of some of the less important restrictions, but not the restriction in question, by some of the plaintiffs does not deprive them, much less the other plaintiffs, of the right to relief in equity."

All exceptions are overruled and the order appealed from is affirmed.

FISHBURNE, STUKES and TAYLOR, JJ., and L. D. LIDE, A. A. J., concur.