519 S.E.2d 583

**Dale MUIR, Employee/Claimant, Respondent,**

v.

**C.R. BARD, INC., Self–Insured Employer, Appellant.**

**No. 3012.**

Court of Appeals of South Carolina.

Heard May 11, 1999.
Decided June 21, 1999.
Rehearing Denied Aug. 28, 1999.

Grady L. Beard and William R. Harbison, of Sowell, Todd, Lafitte, Beard & Watson, of Columbia, for appellant.

David T. Pearlman and J. Kevin Holmes, of The Steinberg Law Firm, of Charleston, for respondent.

ANDERSON, Judge:

Dale Muir brought this Workers' Compensation action alleging he contracted hepatitis C, aplastic anemia and myelodysplasia as a result of examining used foley catheters in his employment with C.R. Bard, Inc. (Bard). The Single Commissioner found Muir's illnesses compensable as occupational diseases. In addition, the Single Commissioner refused to allow Bard a credit for payments of short term and long term disability. The Full Commission and the Circuit Court affirmed. Bard appeals. We affirm.

## FACTS/PROCEDURAL BACKGROUND

The Single Commissioner, Full Commission, and Circuit Court treated Muir's claim as one for occupational disease. Accordingly, we address his claim as one for occupational disease, rather than accidental injury.

In 1977, Muir began working with Davol as a Senior Quality Assurance Engineer in its Moncks Corner facility. Bard purchased Davol in the fall of 1980. Muir continued working for Bard in the same capacity as he had with Davol. As part of his job, Muir inspected failed foley catheters to determine the cause of the problem. He made visual inspections and tried to duplicate the problems. For some catheters, he had to inflate and deflate the balloon. If the balloon did not deflate, Muir would use a syringe with a needle to remove the water. For approximately thirty percent of the catheters, Muir had to dissect them using scissors or exacto knives. He would then microscopically examine the catheter to find the defect. Muir estimated he examined 12,000 to 15,000 failed catheters during his years with Bard.

Initially, the failed catheters were sent to a Bard facility in either Covington, Georgia, or Murray Hill, New Jersey. The failed catheters arrived at the customer complaint department of the Covington facility. The department packaged each

catheter, gave it a number, placed it in a corrugated box, and sent it to the sterilization department to be processed. It took approximately two days for a catheter to get from the customer complaint department to the sterilization department.

The sterilization process took a minimum of three days. First, the catheter went to a preconditioning area to prehumidify it for sterilization. Then, it went through a sterilizer of ethylene oxide gas (EtO). During the first twelve years Muir worked for Bard, the catheters were processed with a blend of EtO and freon. In late 1992, Bard began using 100 percent EtO. After sterilization, the department postconditioned the catheter to allow for off-gassing of the EtO. The catheter remained in postcondition for a minimum of 24 hours. According to Elizabeth Bruette, who is the Operations Manager in charge of EtO sterilization at the Covington facility, the minimum amount of time the catheters are kept in her department is four days.

Bruette testified EtO is labeled a toxic chemical and is possibly carcinogenic. EtO is not approved by the Federal Food and Drug Administration to sterilize used and contaminated medical products. Vivian Stephens, the Field Assurance Manager at Covington, stated there were no guarantees of sterility and no way to validate sterilization. The catheter is bagged without any capability of maintaining sterility. She said they did no decontamination of the samples for fear of alleviating the defective condition. Stephens insisted no other Bard employee has contracted hepatitis C or aplastic anemia.

Approximately one to two days after the sterilization process was completed, the customer complaint department sent the repackaged catheters to the manufacturer. The Covington facility usually sent the catheters to the Moncks Corner facility where Muir worked through regular mail, taking three to four days. Occasionally, the supervisor of the Field Assurance Department in Covington needed expeditious evaluation. Under these circumstances, as soon as the catheter was out of sterilization, it was dispensed through overnight delivery.

When the catheters arrived at the Moncks Corner facility, Muir's assistant would log them in. Muir, at that point, took the catheters to his office for evaluation. The failed catheters were packaged in a plastic bag which was folded over and

stapled shut. A complaint number was written on the plastic bag. A complaint form identifying the complaining hospital, the number of the complaint, and the date of issuance was attached to the bag. A sticker was affixed to the bag indicating the catheter had been processed with EtO sterilization.

Muir described the appearance of the catheters when he received them: "[F]or the most part, considering how they've been used in the hospital, they were relatively clean, they may have some of the lubricant on them." However, approximately twenty-five percent of the catheters had blood on them. Some of the blood was dried on the outside. In catheters where the balloon was ruptured, there was blood underneath the soft, pliable parts of the balloon. In addition, the blood was sometimes covered with the lubricant. In some catheters, the drained lumen was full of crystals which had a "very strong urinary odor." Other catheters had types of odors Muir could not identify. Gloria Jean Kemmerer, the Quality Assurance Secretary assisting Muir, stated the used catheters were damp and some had dried blood on them. They were malodorous and "very nasty."

At the beginning of Muir's employment with Davol, his supervisor told him he could handle the catheters with his bare hands because they had been EtO sterilized. At first, Muir did not use any type of gloves. However, in 1978, once he saw the condition of some of the catheters, he began using gloves.

The only type of gloves Muir used in his examinations were latex exam gloves. At times, water would migrate inside the gloves. Occasionally, the gloves would rip and tear. The catheters were sometimes wet and slippery from the lubricant. About once a month, Muir stuck himself with the scissors or a needle when the catheter he was examining slipped. Muir would simply place an adhesive bandage over the wound, put on another glove, and continue his examination. Sometimes the balloon of the catheter was inflated with water and would not deflate. If Muir touched the outside of the balloon, it would explode and "blow" its contents all over him. He learned by trial and error how to deflate the balloon to avoid such an explosion. Muir was not concerned about his expo-

sure to the catheters and his wounds because he believed the catheters were sterilized.

A blood test in 1986 revealed abnormalities in Muir's liver function and in his white blood cell count. Muir did not have another abnormal blood test until January 25, 1990. That test indicated slightly high liver enzymes, slightly low white blood cell count and a reverse in the percentage of granulocytes to lymph/monos. Muir's family physician, Dr. Jeanne Campbell, described this condition as lymphocytosis. Another test taken January 29, 1990, indicated Muir's white blood cell count was borderline low and showed continued lymphocytosis. Dr. Campbell sent Muir a letter on April 30, 1990, asking him to return to the office for a follow-up on the abnormal tests. Muir did not return to the office until October 26, 1990. The blood test taken that day indicated a slightly low white blood cell count and lymphocytosis.

In 1991, Muir was diagnosed with non-insulin dependent diabetes. On October 17, 1991, he was given a blood test which revealed abnormalities in his enzymes, low white blood cell and red blood cell counts, low hematocrit, high mean corpuscular hemoglobin, and continued lymphocytosis. Dr. Campbell testified the nature of Muir's problem was not clear, but that "[a]t this point [she] would have expressed a low level of concern."

Muir returned to Dr. Campbell on March 12, 1992, complaining of a three week episode of fatigue. Blood work was repeated. His white blood cell count and red blood cell count were both low. Muir's hemoglobin and hematocrit were markedly low and the persistent lymphocytosis was more marked than it had been before. His red blood cells were unusually large and he had an unusually great amount of hemoglobin per cell. That abnormality occurs in individuals with vitamin $B_{12}$ and folic acid deficiencies, and certain types of bone marrow and liver disorders. Dr. Campbell became extremely concerned. She consulted another doctor and tested Muir's $B_{12}$ level, which was normal. She repeated the hematocrit four days later and found it had dropped significantly. Dr. Campbell then referred Muir to Dr. Elizabeth Christian on March 19, 1992, for a bone marrow biopsy.

Dr. Christian stated Muir's bone marrow test was hard to read. He presented with pancytopenia, a depression of the red blood cells, white blood cells, and platelets, indicative of either aplastic anemia or myelodysplasia. According to Dr. Christian, myelodysplasia and aplastic anemia are bone marrow disorders. She later determined Muir suffers from myelodysplasia. To treat anemia, Muir was given two units of packed red blood cells at the end of March. The blood donors for these transfusions tested negative for hepatitis C.

In an antibody test taken April 10, 1992, Muir tested positive for the hepatitis C antibody. Dr. Christian discussed this diagnosis with Muir on April 21, 1992. At the time of Muir's diagnosis, she was of the opinion that the hepatitis C was causing the pancytopenia. A percutaneous liver biopsy taken in November of 1992 indicated Muir had chronic active hepatitis consistent with hepatitis C. In a report dated February 25, 1993, Dr. Christian indicated Muir's "initially positive Hepatitis C antibodies [were] now negative."

After Muir was diagnosed with hepatitis C, he asked the plant nurse if she had any literature on hepatitis C. She provided him with an article on the disease. Muir did research at different libraries and contacted various organizations, including the National Disease Center and the Hepatitis Foundation.

Each time Muir returned from the doctor, he talked to his plant manager, Tom Clark. Initially, he told Clark that he did not know the cause of the hepatitis. After Muir gathered some research, he told Clark the hepatitis C was related to his employment. Muir advised his bosses, Chris Ganser and Joe Diaz, that the hepatitis C was related to his employment. When John Dillinger, the Corporate Director of Quality Control for Bard, visited the Moncks Corner facility in May, 1992, Muir Informed Dillinger that he had been diagnosed with hepatitis C. Additionally, Muir advised Dillinger that he believed he had contracted the disease from handling the corporate complaints. Muir subsequently received a letter of reprimand for having the conversation with Dillinger.

Around June of 1992, Muir served on a committee at Bard discussing ways of Improving the handling of catheters, such as using surgeon's gloves, face masks, and tieback clothing.

Muir stopped working at Bard in August, 1992, before any of these changes were implemented. The person who replaced Muir suits up in a special room in the laboratory with rubber gloves, a hat, and a mask.

As treatment, Muir receives transfusions with packed red blood cells every three weeks. He takes medications as bone marrow stimulants and has to wear a pump that releases a drug to control the iron overload caused by the blood transfusions. As a result of the hepatitis C, Muir's liver is enlarged and painful. In addition, Muir experiences chronic fatigue.

Muir received his full salary for twenty-two weeks under Bard's short term disability policy. Thereafter, he was paid long term disability under the company's plan, to which he had contributed. Muir receives Social Security benefits and long term disability payments comprising sixty percent of his salary.

On March 30, 1993, Muir filed a Form 50 alleging he sustained an occupational disease resulting in Injury to the total body that was diagnosed on April 21, 1992. On the form, Muir alleged he "handled unsanitary catheters without gloves and contracted Hepatitis C and Aplastic Anemia." He did not request a hearing with this form. Bard filed a Form 51 in response denying liability under the Workers' Compensation Act and asserting various defenses. On July 25, 1995, Muir filed a second Form 50 with similar allegations to request a hearing. Again, Bard denied liability. The hearing date was set for December 6, 1995. On November 28, 1995, Muir withdrew his request for a hearing alleging he needed time to conduct further discovery.

On June 6, 1996, Muir filed another Form 50 requesting a hearing. In this form, he asserted he had sustained "an accidental injury to the total body; blood disorder affecting the entire body" on April 21, 1992. He averred he had "handled unsanitary catheters without gloves and contracted Hepatitis C and Aplastic Anemia and/or Myelodysplasia (accident and/or occupational disease)." Bard relied on its previous Form 51 as an answer. A hearing was set for September 30, 1996. On September 30, 1996, Bard requested a continuance to allow for further discovery. A hearing was held March 17, 1997.

In a lengthy order, the Single Commissioner detailed the evidence in the case. She held Muir contracted hepatitis C as a direct result of his exposure to contaminated blood and body fluids while examining and testing failed catheters in his employment with Bard. The Commissioner ruled Muir's aplastic anemia and myelodysplasia were caused by his chronic hepatitis C infection. The Commissioner concluded the hepatitis C, aplastic anemia, and myelodysplasia met the requirements of compensable occupational diseases. She found no probative evidence in the record to support a finding that Muir contracted hepatitis C prior to 1980. She determined he contracted the disease within a year of his last exposure. The Commissioner decided Muir had been totally disabled since August 25, 1992. She held he timely gave notice of having contracted an occupational disease to his employer and that he timely filed a claim for an occupational disease. The Commissioner decreed:

> The probative evidence in the record does not support a finding of fact or ruling of law [that Muir] committed fraud in his employment application, fraud in the Inducement to sign a Form 15, fraud in the Initiation of the claim, suffered from a pre-existing disability to affected members, elected remedies, suffered any intervening cause for his conditions, or is equitably barred from bringing his claim by reason of laches as plead[ed] in [Bard's] Form 51.

She refused to allow Bard an offset or credit for amounts paid to Muir for short and long term disability. The Commissioner ordered Bard to pay Muir five hundred weeks of compensation for his occupationally related total and permanent disability commencing on August 25, 1992. She adjudged that Bard should pay all causally related past and future medical bills and expenses for the treatment of Muir's occupational diseases. The Full Commission and the Circuit Court affirmed.

## *ISSUES*

I. Did the Circuit Court err in affirming the Full Commission's decision Muir contracted an occupational disease, hepatitis C, as a direct result of his employment with C.R. Bard?

II.   Did the Circuit Court err in affirming the Full Commission's conclusion Muir's aplastic anemia and myelodysplasia were caused by his hepatitis C?

III.   Did the Circuit Court err in refusing to find the Commission violated C.R. Bard's due process rights?

IV.   Did the Circuit Court err in failing to rule the Commission should have added Davol as a defendant?

V.   Did the Circuit Court err in affirming the Commission's conclusion Muir's claim compiled with S.C.Code Ann. § 42–11–70 (1985)?

VI.   Did the Circuit Court err in refusing to reverse the Commission's decision Muir gave timely notice of his claim pursuant to S.C.Code Ann. § 42–15–20 (1985)?

VII.   Did the Circuit Court err in failing to reverse the Commission's ruling Muir's claim was not barred by the statute of limitations, S.C.Code Ann. § 42–15–40 (Supp. 1998)?

VIII.   Did the Circuit Court err in refusing to reverse the Commission's holding Muir's claim was not barred by the doctrine of laches?

IX.   Did the Circuit Court err in failing to award C.R. Bard a credit for short and long term disability payments it made to Muir?

X.   Did the Circuit Court err in failing to find the Commission made prejudicial and erroneous evidentiary rulings warranting reversal of its decision?

### STANDARD OF REVIEW

The Full Commission is the ultimate fact finder in Workers' Compensation cases and is not bound by the Single Commissioner's findings of fact. *Ross v. American Red Cross*, 298 S.C. 490, 381 S.E.2d 728 (1989). *See also Hoxit v. Michelin Tire Corp.*, 304 S.C. 461, 405 S.E.2d 407 (1991) (Full Commission is fact finder and it is not within Supreme Court's province to reverse Commission's findings if they are supported by substantial evidence). Although it is logical for the Full Commission, which did not have the benefit of observing the witnesses, to give weight to the Single Commissioner's opinion, the Full Commission is empowered to make its own findings of fact and to reach its own conclusions of law

consistent or inconsistent with those of the Single Commissioner. *McGuffin v. Schlumberger–Sangamo*, 307 S.C. 184, 414 S.E.2d 162 (1992). The final determination of witness credibility and the weight to be accorded evidence is reserved to the Full Commission. *Ross, supra.*

▮▮▮ The findings of the Commission are presumed correct and will be set aside only if unsupported by substantial evidence. *Medlin v. Upstate Plaster Serv.*, 329 S.C. 92, 495 S.E.2d 447 (1998). *See also Smith v. Squires Timber Co.*, 311 S.C. 321, 428 S.E.2d 878 (1993) (under Supreme Court's scope of review, Commission's denial of Workers' Compensation benefits must be affirmed if supported by substantial evidence in record). It is not within our province to reverse findings of the Commission which are supported by substantial evidence. *Hunter v. Patrick Constr. Co.*, 289 S.C. 46, 344 S.E.2d 613 (1986).

▮▮▮ A court may not substitute its judgment for that of an agency as to the weight of the evidence on questions of fact unless the agency's findings are clearly erroneous in view of the reliable, probative and substantial evidence on the whole record. *Tiller v. National Health Care Ctr.*, 334 S.C. 333, 513 S.E.2d 843 (1999); *Clade v. Champion Laboratories*, 330 S.C. 8, 496 S.E.2d 856 (1998). Substantial evidence is not a mere scintilia of evidence, nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion the administrative agency reached in order to justify its action. *Miller v. State Roofing Co.*, 312 S.C. 452, 441 S.E.2d 323 (1994); *Stokes v. First Nat'l Bank*, 306 S.C. 46, 410 S.E.2d 248 (1991). Where there is a conflict in the evidence, either by different witnesses or in the testimony of the same witness, the findings of fact of the Commission are conclusive. *Tiller, supra.* Indeed, the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. *Id.; Clade, supra.* Worker's Compensation awards must not be based on surmise, conjecture or speculation. *Tiller, supra.* A court may reverse or modify the Commission's decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences,

conclusions or decisions are affected by other error of law. *Stephen v. Avins Constr. Co.*, 324 S.C. 334, 478 S.E.2d 74 (Ct.App.1996).

## *LAW/ANALYSIS*

### I. Hepatitis C as Occupational Disease Contracted Through Employment with Bard

Bard argues the Circuit Court erred in affirming the Full Commission's decision that Muir contracted an occupational disease, hepatitis C, as a direct result of his employment with Bard. We disagree.

A claimant must prove the following six elements in order to receive Workers' Compensation benefits for having contracted an occupational disease:

1. A disease;

2. The disease must arise out of and in the course of the claimant's employment;

3. The disease must be due to hazards in excess of those hazards that are ordinarily incident to employment;

4. The disease must be peculiar to the occupation in which the claimant was engaged;

5. The hazard causing the disease must be one recognized as peculiar to a particular trade, process, occupation, or employment; and

6. The disease must directly result from the claimant's continuous exposure to the normal working conditions of the particular trade, process, occupation, or employment.

*Fox v. Newberry County Memorial Hosp.*, 319 S.C. 278, 281, 461 S.E.2d 392, 394 (1995).

### A. Findings of Fact

Bard contends the Commission failed to make sufficient findings of fact on each of the *Fox* elements. In *Fox,* the Supreme Court found the Single Commissioner made insufficient findings of fact on the elements of an occupational disease. The Court explained:

[T]he Commissioner never acknowledged that there were six elements that a claimant must prove to recover benefits

for contraction of an occupational disease. It can be assumed that he found that herpetic whitlow is a disease, although that was never specifically stated. It can also be assumed that the Commissioner's statement "[respondent's] condition of herpetic whitlow is found to be work related ..." is sufficient to meet element two, which is that the disease must arise out of and in the course of the claimant's employment. However, the remaining four elements are not addressed at all. While the Commissioner defines the term "peculiar to the occupation," he never made any factual findings regarding that element. Nor did he address the conflicting testimony provided by two experts as to whether herpetic whitlow is peculiar to the medical profession. Therefore, even if it is assumed that he found that herpetic whitlow is peculiar to the medical profession, it is impossible to know what facts he relied upon.

*Fox,* 319 S.C. at 282, 461 S.E.2d at 394–95. *See also Parsons v. Georgetown Steel,* 318 S.C. 63, 456 S.E.2d 366 (1995) (findings of fact of administrative body must be sufficiently detailed to enable reviewing court to determine whether findings are supported by evidence).

The Single Commissioner, in her order, which the Full Commission adopted, made a specific finding on each of the elements of an occupational disease in the "Rulings of Law" section. In addition, the Commissioner meticulously recited the evidence in the case, including the contradictory medical testimony. She also made detailed findings of fact to support her conclusion that Muir contracted hepatitis C as a result of his exposure to contaminated blood and body fluids while examining the catheters as an employee of Bard.

Bard particularly challenges the Commissioner's finding that "[t]he hazard or risk of contracting hepatitis C is recognized as peculiar to any trade, process, occupation, or employment where workers are exposed to blood or bodily fluids." The Commissioner noted Dr. Edwin A. Brown stated transmission from needle sticks had been documented. She further cited the testimony of Dr. Christian, who stated the most probable origin of the hepatitis C was contamination through bodily fluid on the catheters, and the testimony of Dr. Paul Yantis, who stated Muir most probably contracted the hepati-

tis C from a catheter contaminated with the blood of an Infected person.

We find the Single Commissioner made sufficient findings of fact as to each of the elements of an occupational disease.

### B. Substantial Evidence as to Causation

Bard claims Muir presented insufficient expert evidence to establish the hepatitis C arose out of his employment. Therefore, Bard asserts the substantial evidence in the record fails to support the Commission's conclusion there was a causal link between Muir's employment with Bard and his contraction of hepatitis C.

In an illuminating academic analysis, our Supreme Court in *Tiller v. National Health Care Ctr.*, 334 S.C. 333, 513 S.E.2d 843 (1999), departed from the Inexorable and inflexible parameters structured by the "most probable" evidentiary rule. *Tiller* inculcates the Bench and Bar:

National Health argues in this medically complex case respondent failed to provide expert medical testimony about causation as required by *Smith v. Michelin Tire Corp.*, 320 S.C. 296, 465 S.E.2d 96 (Ct.App.1995), and thus did not carry her burden of proof. . . .

. . . .

In *Smith,* the Court of Appeals held "if the claimant is attempting to establish causation of a medically complex condition, however, expert testimony is required." *Id.* at 298, 465 S.E.2d at 97. . . .

. . . .

However, our case law does not support application of this rule in workers' compensation cases. *See Lorick [v. S.C. Elec. & Gas Co.,* 245 S.C. 513, 141 S.E.2d 662 (1965)], *supra* (the Court found neither the expert testimony nor the lay testimony provided evidentiary support of a causal connection); *Dennis [v. Williams Furniture Corp.,* 243 S.C. 53, 132 S.E.2d 1 (1963)], *supra* (viewing the evidence in the light most favorable to claimant, there was no competent evidence to support an award). Instead, the Commission is given discretion to weigh and consider all the evidence, both lay and expert, when deciding whether causation has been established. *See Ballenger v. Southern Worsted Corp.,* 209

S.C. 463, 40 S.E.2d 681 (1946) (despite doctor's testimony that there was not a connection with the accident that caused almost boiling dye to fall in claimant's face and eyes and his subsequent eye problems, lay testimony of claimant's good vision before the accident was sufficient to support an award); *Poston v. Southeastern Construction Co.,* 208 S.C. 35, 36 S.E.2d 858 (1946) (lay testimony that claimant's eyes became runny and inflamed after some construction material blew into them and that claimant lost vision in eyes subsequent to the accident was sufficient to support an award, even though doctor testified vision loss was not related to job injuries). Thus, while medical testimony is entitled to great respect, the fact finder may disregard it if there is other competent evidence in the record. *Ballenger, supra.* Indeed, "medical testimony should not be held conclusive Irrespective of other evidence." *Ballenger,* 209 at 467, 40 S.E.2d at 682–83.

. . . .

If a medical expert is unwilling to state with certainty a connection between an accident and an injury, the "expression of a cautious opinion" may support an award if there are facts outside the medical testimony that also support an award. *Grice v. Dickerson, Inc.,* 241 S.C. 225, 127 S.E.2d 722 (1962) (where medical testimony definitely recognized the possibility of a causal connection between the accident and the rheumatoid arthritis but no medical testimony stated a connection to a reasonable degree of medical certainty, the Commission had to weigh the facts in light of the medical possibilities and draw Inferences consistent with the medical testimony in the record); *Brewer v. Charleston Shipbuilding & Drydock Co.,* 212 S.C. 43, 46 S.E.2d 173 (1948) (doctor's testimony indicating a connection between claimant's accident and his subsequent fungal infection, though not stated to a reasonable degree of medical certainty, was sufficient to support an award when combined with lay testimony about claimant's health before and after the accident, despite the testimony of another doctor that stated there was no connection). Thus, if medical expert testimony is not solely relied upon to establish causation, the fact finder must look to the facts and circumstances of the case. *Grice, supra.* Proof that a claimant

sustained an Injury may be established by circumstantial and direct evidence where circumstances lead an unprejudiced mind to reasonably infer the injury was caused by the accident. *Grice, supra; Hewitt v. Cheraw Cotton Mills,* 217 S.C. 90, 59 S.E.2d 712 (1950). However, such evidence need not reach such a degree of certainty as to exclude every reasonable or possible conclusion other than that reached by the Commission. *Grice, supra.*

Unlike the Court of Appeals, we decline to apply the standard set out in *Smith.* Instead, in deciding whether substantial evidence supports a finding of causation, we consider both the lay and expert evidence.

*Tiller* at 341, 513 S.E.2d at 847 (footnotes omitted).

Dr. Jeanne Campbell was Muir's family physician. She has a specialty in internal medicine and a Ph.D. in biochemistry. Dr. Campbell has seen patients with hepatitis C in her practice and has a general medical background regarding the disease. According to Dr. Campbell, the main risks for hepatitis C are "[t]ransfusions with contaminated blood; needle sharing such as drug addicts do; sexual intercourse with an infected person; transfer of body fluids from an infected person by any means, whether it's a health care worker or somebody that somebody is involved in an altercation with."

She stated Muir had no risk factors other than the exposure he received at his job. Muir testified he: (1) is not an intravenous drug user; (2) did not use needles to control his diabetes; (3) does not have any tattoos or body piercings; (4) has been in a stable, monogamous marriage for forty-two years; (5) has traveled to Malaysia to visit Bard's plant there; (6) is not a homosexual; (7) had not received any blood transfusions prior to the transfusions to treat the aplastic anemia; (8) had no exposure to blood, blood products, or bodily fluids except in his employment with Bard; and (9) used paint thinners occasionally, but only in well ventilated areas. Muir's wife did not have hepatitis. She was responsible for yard work, including application of herbicides and fertilizers.

Dr. Campbell admitted she would defer to a hepatitis C expert on whether blood transfusions are the major cause of hepatitis C and on whether Muir, in fact, has hepatitis C, if

she thought the expert was reputable. She said: "I feel comfortable enough with hepatitis to sit down and have a discussion about it with my patients; but in a deposition if somebody is going to try to pin me down to a fact, no, I don't feel comfortable enough to swear by it unless I have the open volumes in front of me." However, she opined *"the most probable origin [of Muir's hepatitis C] is contamination via bodily fluids with which he came into contact while working with the catheters at C.R. Bard."*

Dr. Elizabeth Christian is a specialist in internal medicine, hematology, and oncology. She admitted she is not an authority in hepatology. Nonetheless, she gave her opinion that Muir most likely contracted hepatitis C from the catheters. Dr. Christian testified: *"I feel that the most likely area [for Muir contracting hepatitis C] is going to be from the catheters." See Madison v. Brantley,* 302 S.C. 282, 395 S.E.2d 190 (Ct.App.1990) (testimony of medical malpractice plaintiff's expert using phrase "more likely than not" satisfied "most probably" standard required for finding of causation).

Dr. Paul Yantis is board certified in internal medicine with a subspecialty in gastroenterology. Dr. Yantis testified:

According to records, the only risk factor I can see for Mr. Muir developing hepatitis C would be the exposure he had at work to the catheters that he inspected on a regular basis. All it would take would be one catheter that had blood on it from a person who was infected with the hepatitis C virus.

Mr. Muir coming into contact directly with this catheter and having any kind of open cuts or sores on his hands would certainly have had enough exposure in order to contract the disease.

According to the records provided me, Mr. Muir had no other known risk factors for contracting hepatitis C virus, that is, IV drug abuse, multiple sexual partners, either heterosexual or homosexual, or previous blood transfusions. . . .

. . . .

It is my opinion, to a reasonable degree of medical certainty, that Mr. Muir has chronic hepatitis C and *most probably* contracted this disease from an infected urinary

catheter that was contaminated with the blood of a person infected with the hepatitis C virus.

When asked if he would defer to a hepatitis C expert, Dr. Yantis responded: "I am not saying there are not some out there that, like you say, specialize only in—they don't see any patients that don't have hepatitis or hepatitis C. Yeah, they may see more than I do, but I don't think that makes their opinion any different than mine, or them any more of an expert than myself."

Dr. Roger Russell is certified in clinical pathology. He considers his areas of expertise to be clinical chemistry, a subspecialty in toxicology, and clinical pathology, including all aspects such as transfusion medicine, microbiology, immunology, clinical chemistry, and hematology.

Dr. Russell reported "EtO sterilization was never intended to be used to 'sterilize' soiled medical devices. Bodily fluids and other substances absorb the gas and prevent its penetration to the viruses and bacteria it is intended to kill. Furthermore, its use with soiled medical devices will result in increased EtO absorption requiring substantially longer off gassing intervals to prevent harmful exposure to residual toxic gas." Dr. Russell noted Muir did not have any of the risk factors. He reported that the blood utilized in the transfusions Muir received prior to his hepatitis C diagnosis was screened for hepatitis C with negative results and that the donors remained free from hepatitis C. Dr. Russell declared: *"Having eliminated these risk factors, I can state to a reasonable degree of medical certainty that Mr. Muir most probably contracted Hepatitis C from his occupational exposure to contaminated medical devices."* In addition, Dr. Russell related: "The risk of contracting infectious diseases, including Hepatitis C, is well documented and recognized in persons exposed to medical devices contaminated with bodily fluids." He stated Muir was certainly exposed to a greater risk of hepatitis C infection than the ordinary public.

Bard's expert witness, Dr. Edwin Brown, has a specialty in internal medicine with a subspecialty in infectious diseases. He found the transmission of hepatitis C to Muir through the catheters "unlikely because of the small amount or the absence of virus in urine, the rapid inactivation of virus outside

of the body or a carefully controlled environment, and the lack of transmission [of hepatitis C] by skin contact alone." He declared: "Although health care workers are not at increased risk of hepatitis C infection, transmission of HCV has been documented by needle injury in health care workers when a needle, recently contaminated with blood from an HCV infected individual, is inadvertently inserted into the health care worker."

While Bard's expert witness, Dr. Brown, is a qualified expert, he was not Muir's treating physician. His opinion appears to be based on an incomplete knowledge of the facts of Muir's case. He does not take into consideration in his report that Muir cut himself while dissecting the catheters or that in some catheters the blood was soft and pliant where it had been protected by a burst balloon or lubricant.

With linguistic eloquence and nonpareil clarity, we are guided by *Tiller* into a meticulous review of the evidence. Cognizant of the conflicting evidence, we give all-encompassing efficacy to *Tiller* and come to the adamantine conclusion that substantial evidence: (1) demonstrates hepatitis C is an occupational disease and the Commission made sufficient findings of fact on each of the elements of an occupational disease; (2) supports the Commission's decision that Muir's hepatitis C is an occupational disease; and (3) reveals Muir's hepatitis C resulted from his contact with catheters while employed with C.R. Bard.

## II. Connection of Hepatitis C to Aplastic Anemia and Myelodysplasia

Bard maintains the Circuit Court erred in affirming the Full Commission's conclusion that Muir's aplastic anemia and myelodysplasia were caused by his hepatitis C. We disagree.

Dr. Christian identified the most common causes of aplastic anemia as: (1) viral etiologies; (2) possibly due to toxic drugs, usually not antibiotics; and (3) exposure to toxic chemicals, such as herbicides, pesticides, and benzene, which is used in lab chemicals. In addition, she related hepatitis C is known to be a cause of aplastic anemia. This fact is documented in a plethora of hematology books and in multiple papers. Dr.

Christian reported: *"Since myelodysplasia is related to aplastic anemia, in my opinion, it seems likely that the Hepatitis C virus could also be the cause of myelodysplasia."*

During Dr. Christian's deposition, Bard's counsel questioned: "Are you sitting here today willing to give an opinion to a reasonable degree of medical certainty that hepatitis C is the most probable cause of Dale Muir's aplastic anemia and/or myelodysplasia?" Dr. Christian replied, *"I think it's the most common cause, in my opinion."* She explained her opinion was *"[d]ue to the fact that he presented with pancytopenia, he had positive hepatitis C antibodies, and he had a liver biopsy that was positive for hepatitis."*

In Dr. Russell's report dated September 19, 1996, he wrote:

There is medical literature associating Hepatitis C with bone marrow suppression, anemia, and aplastic anemia. Initial laboratory studies and the clinical diagnosis in Mr. Muir's case were consistent with aplastic anemia. He has subsequently been diagnosed by bone marrow biopsy as having myelodysplasia. There is also medical literature associating aplastic anemia with progression to myelodysplasia and subsequently to leukemia, especially in patients who are treated with stimulating medications such as erythropoietin and Neupogen (G–CSF) like Mr. Muir has been (and currently is being) treated with.

On the other hand, Bard's expert, Dr. Brown, related: "Hepatitis C specialists do not believe that HCV infection causes aplastic anemia. Evidence is available that a non-A, non-B, non-C hepatitis virus (a virus that is not hepatitis A, hepatitis B, or hepatitis C) may cause aplastic anemia." In a pamphlet, the Aplastic Anemia Foundation Association reported the National Institute of Health had determined the type of hepatitis associated with aplastic anemia is "non-A non-B non-C." The pamphlet further provides: "It is thought that patients with the hepatitis/aplasia syndrome may have been infected with a novel, as yet uncharacterized virus that causes damage to both liver and bone marrow."

Substantial evidence exists to buttress the Commissions conclusion that Muir's hepatitis C infection caused the aplastic anemia and myelodysplasia.

### III. Due Process

Bard avers the Circuit Court erred in refusing to find the Full Commission violated its statutory and constitutional due process rights. We disagree.

First, Bard argues the Commission lacked familiarity with the claim when it decided the case. Bard bases this complaint on the fact that each Commissioner voted on the case the same day they heard oral argument. We find this argument meritless.

In its order, the Commission stated: "Pursuant to S.C.Code Ann. § 42–17–50 (1985), we, the Full Commission, have reviewed the Award and weighed the evidence as presented at the initial hearing. We have also considered all issues raised in the briefs of the appellant(s) and the respondent(s)." This Court finds the questions the Commissioners asked during the hearing were attempts to have the parties narrow the issues, rather than admissions that the Commissioners were unfamiliar with the record. We have no reason to doubt the Commissioners thoroughly reviewed the records and briefs of the parties before making their decision.

Second, Bard contends it was denied due process because the Single Commissioner did not allow it to call Dr. Russell and other live witnesses. Bard wrote the Commissioner informing her that it considered calling Dr. Russell as a live witness at the hearing. The Commissioner responded: "I strongly advise against calling an expert witness. Generally this is not allowed in administrative hearings." Bard did not call Dr. Russell to testify at the hearing. Although the Commissioner strongly *recommended* against calling an expert witness, she never ruled Bard could not call Dr. Russell at the trial.

We find Bard waived its right to have Dr. Russell testify at the hearing by failing to call him to testify. In addition, Bard did not attempt to depose Dr. Russell after he wrote his March 7, 1997, report. As a result, Bard waived its right to cross examine Dr. Russell on the report.

### IV. Addition of Davol as a Party

██ Bard claims the Circuit Court erred in failing to rule the Full Commission should have added Davol as a defendant. We disagree.

In its Form 51, Bard asserted it reserved the right to add additional parties as more information became available. In its grounds for review to the Commission, Bard listed as an issue: "Did the Hearing Commissioner err as a matter of law in failing to add Davol and its workers' compensation carrier from 1977 to 1980 as an indespensable [sic] and necessary party based upon the testimony at the Hearing?" Bard never moved before the Single Commissioner to add Davol as a party. Instead, the issue before the Single Commissioner was whether Bard was Muir's employer when he contracted hepatitis C.

In *Glenn v. Columbia Silica Sand Co.*, 236 S.C. 13, 112 S.E.2d 711 (1960), our Supreme Court noted:

"In the case of occupational disease, liability is most frequently assigned to the carrier who was on the risk when the disease resulted in disability, if the employment at the time of disability was of a kind contributing to the disease.... Occupational disease cases typically show a long history of exposure without actual disability, culminating in the enforced cessation of work on a definite date. In the search for an identifiable instant in time which can ... fix the employer and insurer liable for compensation [for an occupational disease], the date of disability has been found the most satisfactory."

*Glenn*, 236 S.C. at 19–20, 112 S.E.2d at 714. This Court, in *Hanks v. Blair Mills, Inc.*, 286 S.C. 378, 386, 335 S.E.2d 91, 96 (Ct.App.1985), refused to adopt the apportionment rule "under which liability is apportioned among all the employee's employers, and their carriers, whose conditions of employment were of the type contributing to the disease." We found it would place an unduly harsh burden on an employee to notify, file a claim, and prove a compensable injury against the many employers whose conditions of employment may have contributed to his injury. *Id.* See also *Reese v. CCI Constr. Co.*, 334 S.C. 600, 514 S.E.2d 144 (1999) (finding that although carpenter had only worked for employer for three days at time of

diagnosis of occupational disease, employer may be liable under act).

According to Dr. Yantis, it takes three to six months from the time of exposure until hepatitis C causes problems with the liver. He noted a person can have hepatitis "for awhile [sic] and have very little indication of damage." He said "the average time, from the time of exposure until the time of severe liver damage leading to cirrhosis, is about 16 years." He opined Muir had hepatitis C as early as 1986.

Muir's work with Bard was the type that could lead to exposure to hepatitis. Nothing in the evidence indicates Muir had hepatitis prior to Bard's purchase of Davol. Although Muir pleaded in his Form 50 that his hepatitis was caused by "handl[ing] unsanitary catheters without gloves," the evidence demonstrates Muir was also exposed when the gloves he wore tore or leaked and when he punctured himself with the scissors, knives or needles he was using to dissect the catheters. Bard's own witness, Dr. Brown, further minimized the significance of Muir's failure to use gloves while working for Davol. According to Dr. Brown: "Transmission of HCV has not been documented from contact of intact skin with HCV Infected blood or body fluids." Following *Hanks*, we find no error in the Commission's failure to add Davol as a party.

### V. Compliance with S.C.Code Ann. § 42–11–70 (1985)

■ Bard maintains the Circuit Court erred in affirming the Commission's conclusion Muir's claim complied with S.C.Code Ann. § 42–11–70 (1985). We disagree.

Section 42–11–70 provides:

Neither an employee nor his dependents shall be entitled to compensation for disability or death from an occupational disease, except that due to exposure to ionizing radiation, unless such disease was contracted within one year after the last exposure to the hazard peculiar to his employment which caused the disease, save that in the case of a pulmonary disease arising out of the inhalation of organic or inorganic dusts the period shall be two years.

The hazard peculiar to Muir's employment was exposure to the hepatitis C virus through the used catheters. The evidence indicates that, in addition to the time period he did not

wear gloves, Muir was exposed to the virus when the gloves he wore tore or leaked and when he punctured himself while dissecting the catheters. Muir was last exposed to the catheters in August, 1992. We find Muir's claim meets the requirements of § 42–11–70.

## VI. Notice Requirement, S.C.Code
## Ann. § 42–15–20 (1985)

■■■ Bard avers the Circuit Court erred in refusing to reverse the Commission's decision that Muir gave timely notice of his claim pursuant to S.C.Code Ann. § 42–15–20 (1985).

■■■ Section 42–15–20 requires an injured employee to "immediately on the occurrence of an accident, or as soon thereafter as practicable, give or cause to be given to the employer a notice of the accident." Generally, the injury is not compensable unless notice is given within ninety days. *Id.* With an occupational disease, the "accident" occurs when the employee becomes disabled and could, through reasonable diligence, discover that his condition is compensable. *Bailey v. Covil Corp.*, 291 S.C. 417, 354 S.E.2d 35 (1987); *Hanks v. Blair Mills, Inc.*, 286 S.C. 378, 335 S.E.2d 91 (Ct.App.1985). In occupational disease cases, compensability accrues at the time of death or disability. *See Glenn v. Columbia Silica Sand Co.*, 236 S.C. 13, 112 S.E.2d 711 (1960).

Bard argues Muir did not give timely notice of injury because he was not reasonable in discovering the nature of his medical problems. It does not dispute Muir's testimony that he informed his superiors at Bard in the spring of 1992 of his diagnosis and belief that he had contracted the hepatitis through handling the catheters.

Notice begins to run when the employee becomes disabled and could discover with reasonable diligence his condition is compensable. Muir did not become disabled by his condition until August, 1992. Therefore, Muir had actually given notice of the nature of his disease before he became disabled.

We find Muir was not unreasonable in his discovery that his condition was compensable. Although Muir's blood work indicated abnormalities, his treating physician, Dr. Campbell, was not overly concerned until March of 1992 when his white blood

cell, red blood cell, and platelet count dropped precipitously. Muir was diagnosed with hepatitis C in April, 1992, and had given notice to several of his superiors in May, 1992.

## VII. Statute of Limitations, S.C.Code Ann. § 42–15–40 (Supp.1998)

Bard contends Muir's claim was barred by the statute of limitations prescribed in S.C.Code Ann. § 42–15–40 (Supp. 1998). We find this argument manifestly without merit.

Pursuant to § 42–15–40, "[t]he right to compensation ... is barred unless a claim is filed with the commission within two years after an accident.... However, for occupational disease claims the two-year period does not begin to run until the employee concerned has been diagnosed definitively as having an occupational disease and has been notified of the diagnosis." Muir was diagnosed with hepatitis C on April 21, 1992. He flied his original Form 50 to initiate the claim on March 30, 1993, not July 25, 1995, as Bard asserts in its brief. Accordingly, we find Muir's claim is not barred by the statute of limitations.

## VIII. Laches

Bard maintains Muir's claim is barred by the doctrine of laches. We disagree.

Laches is neglect for an unreasonable and unexplained length of time, under circumstances affording opportunity for diligence, to do what in law should have been done. *Mid–State Trust, II v. Wright,* 323 S.C. 303, 474 S.E.2d 421 (1996). *See also Provident Life and Accident Ins. Co. v. Driver,* 317 S.C. 471, 451 S.E.2d 924 (Ct.App.1994) (laches is negligent failure to act for unreasonable period of time). Under the doctrine of laches, if a party, knowing his rights, does not timely assert them, but by unreasonable delay causes his adversary to incur expenses or otherwise detrimentally change his position, then equity will ordinarily refuse to enforce these rights. *Id.* Importantly, delay in the assertion of a right does not, in and of itself, constitute laches. *Mid–State Trust, supra.* Rather, so long as there is no knowledge of the wrong committed and no refusal to embrace opportunity to ascertain facts, there can be no laches. *Id.; Archambault*

*v. Sprouse,* 218 S.C. 500, 63 S.E.2d 459 (1951). The failure to assert a right does not come into existence until there is a reason or situation that demands assertion. *Mid–State Trust, supra.* The party asserting laches must satisfactorily show negligence, the opportunity to have acted sooner, and material prejudice. *Provident Life and Accident, supra. See also Mid–State, supra* (party asserting laches must show it has been materially prejudiced by other party's delay). The burden of proof is upon the person claiming laches. *Provident Life and Accident, supra.* Finally, whether laches applies in a particular situation is highly fact-specific, so each case must be judged on its own merits. *Mid–State, supra.*

Bard argues it was prejudiced by Muir's failure to timely pursue his claim. It asserts Muir did not mention the individuals he allegedly notified about his problems until the hearing. However, in a deposition taken August 23, 1993, Muir testified he told Tom Clark and Joe Diaz of his problems soon after reading a report the plant nurse provided him on April 22, 1992. At the hearing, Muir stated he told John Dillinger about his diagnosis of hepatitis and his belief the illness was work related. Muir's failure to mention Dillinger earlier is harmless as his discussions with Clark and Diaz fulfilled the notice requirements of § 42–15–20. Although Muir did not call Clark or Diaz as witnesses, there is no evidence in the record that Bard was prevented from calling them.

Furthermore, this case involved a medically complex issue that necessitated extensive discovery. Muir withdrew his request for a hearing once to allow for additional discovery. Thereafter, Bard asked for a continuance of a scheduled hearing to allow for discovery. We do not find Muir was unreasonable in pursuing his claim.

## IX.   Credit for Short and Long
## Term Disability Payments

Bard avers it is entitled to a credit for short term and long term disability payments made to Muir under its group benefits plan. We disagree.

South Carolina Code Ann. § 42–9–210 (1985) reads:

Any payments made by an employer to an injured employee during the period of his disability, or to his depen-

dents, which by the terms of this Tide were not due and payable when made may, subject to the approval of the Commission, be deducted from the amount to be paid as compensation; *provided,* that in the case of disability such deductions shall be made by shortening the period during which compensation must be paid and not by reducing the amount of the weekly payment (emphasis in original).

■■■■ The approval of the Commission for such deduction is required by § 42–9–210. The Commission's conclusions are binding on appeal unless there is an absence of competent evidence to support them. *Brittle v. Raybestos–Manhattan, Inc.,* 241 S.C. 255, 127 S.E.2d 884 (1962). In order for payments to be deductible, they must have been made with reference to liability under the provisions of the Act and intended to be in lieu of compensation. *Id.* "Since only those payments are deductible which are made in contemplation of the legal obligation of the employer to pay compensation to a disabled employee, the intent with which such payments are made becomes important." *Brittle,* 241 S.C. at 258, 127 S.E.2d at 885.

The payments Muir received were from a benefits plan to which Muir had contributed premiums. Bard denied Muir's injuries were compensable. We find no evidence in the record that the payments were made with reference to liability under the Act and in lieu of compensation. We rule Bard was not entitled to a credit for the payments.[1]

## X. Evidentiary Rulings

■■■ Finally, Bard argues the Commission made several prejudicial and erroneous evidentiary rulings warranting reversal of its decision. We disagree.

First, we note Bard's arguments are so conclusory that they may be deemed abandoned. *Solomon v. City Realty Co.,* 262 S.C. 198, 203 S.E.2d 435 (1974) (conclusory argument is deemed abandoned); *Fields v. Melrose Limited Partnership,* 312 S.C. 102, 439 S.E.2d 283 (Ct.App.1993) (issue is deemed abandoned on appeal and, therefore, not presented for review, if it is argued in a short, conclusory statement without sup-

---

1. We take no position on Bard's subrogation rights.

porting authority). Nonetheless, we will review each argument in turn.

Bard contends the Commissioner erred in admitting Dr. Russell's report dated March 7, 1997. As found above, Bard waived its right to cross-examine Dr. Russell by failing to depose him or call him as a witness to testify. We find no error in the admission of the report. Furthermore, the report is cumulative to Dr. Russell's first report and the other evidence in the record. We, therefore, find its admission harmless. *See Taylor v. Medenica*, 324 S.C. 200, 479 S.E.2d 35 (1996) (admission of improper evidence is harmless where it is merely cumulative to other evidence).

■ Bard next challenges the admission of letters from Dr. Lyle L. Sensenbrenner, Dr. Elaine K. Jeter, and Dr. G.F. Worsham asserting Muir failed to lay a sufficient foundation for the letters, which contained hearsay.

Dr. Jeter of the American Red Cross stated in her letter that the donors for Muir's transfusions had tested nonreactive for all hepatitis related tests. Dr. Worsham of Roper Hospital wrote in his letter that all units of blood provided to the hospital "had been tested negative" for the hepatitis C antibody during the period Muir was transfused. Dr. Campbell testified in her deposition that the donors for the prediagnosis transfusions tested negative for hepatitis C. This testimony was admitted without objection. In addition, Dr. Russell stated in his first report that the transfusions were not contaminated with hepatitis C virus. We find the letters from Dr. Jeter and Dr. Worsham were cumulative to Dr. Campbell's testimony. Therefore, any error in the admission of the letters was harmless. *See Taylor, supra* (admission of improper evidence is harmless where it is merely cumulative to other evidence).

■ In·a letter dated October 20, 1994, Dr. Sensenbrenner, Director of the Bone Marrow Transplantation Program at Harper Hospital in Detroit, Michigan, stated myelodysplasia frequently follows aplastic anemia, "myelodysplasia presents looking like aplastic anemia," and the two are "very hard to tell apart in about 15% of myelodysplasia cases." Dr. Campbell testified myelodysplasia is related to aplastic anemia. Further, in Dr. Russell's report dated September 19, 1996, he

wrote there is medical literature associating aplastic anemia with progression to myelodysplasia. We conclude the letter from Dr. Sensenbrenner was cumulative to Dr. Campbell's testimony and Dr. Russell's report. Concomitantly, any error in the admission of the letter was harmless. *See Taylor, supra* (admission of improper evidence is harmless where it is merely cumulative to other evidence).

Bard claims Muir failed to lay a proper foundation for the EtO label. The efficacy of EtO sterilization was discussed with specificity by Dr. Roger Russell and Elizabeth Bruette. The label is cumulative to the testimony of Dr. Russell and Bruette. Thus, any error in the admission of the label is harmless. *Id.*

Lastly, Bard maintains the admission of Rivers Reams's deposition was error. In the one page of the deposition in the record, Reams discusses the condition of the catheters. His testimony is cumulative to Muir's and his assistant's descriptions of the catheters. Accordingly, we find any error in its admission harmless. *Id.*

## *CONCLUSION*

We hold the trial court did not err in (1) affirming the Full Commission's decision Muir contracted an occupational disease, hepatitis C, as a direct result of his employment with Bard; (2) affirming the Full Commission's conclusion Muir's aplastic anemia and myelodysplasia were caused by hepatitis C; (3) refusing to find the Commission violated Bard's due process rights; (4) failing to rule the Commission should have added Davol as a defendant; (5) affirming the Commission's conclusion Muir's claim compiled with S.C .Code Ann. § 42–11–70; (6) refusing to reverse the Commission's decision Muir gave timely notice of his claim pursuant to S.C.Code Ann. § 42–15–20; (7) failing to reverse the Commission's ruling Muir's claim was not barred by the statute of limitations, S.C.Code Ann. § 42–15–40; (8) refusing to reverse the Commission's holding Muir's claim was not barred by the doctrine of laches; (9) failing to award Bard a credit for short and long term disability payments it made to Muir; and (10) failing to find the Commission made prejudicial and erroneous eviden-

tiary rulings warranting reversal of its decision. Accordingly, the order of the Circuit Court is

**AFFIRMED.**

CURETON and STILWELL, JJ., concur.