# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Vickie Rummage, Employee, Appellant,

v.

BGF Industries, Employer, and Great American Alliance
Insurance Co., Carrier, Respondents.

Appellate Case No. 2018-000359

———————————

Appeal From The Workers' Compensation Commission

———————————

Opinion No. 5822
Heard September 23, 2020 – Filed May 19, 2021

———————————

## AFFIRMED

———————————

Andrew Nathan Safran, of Andrew N. Safran, LLC, of
Columbia, for Appellant.

Michael Allen Farry and Jeremy R. Summerlin, both of
Horton Law Firm, P.A., of Greenville, for Respondents.

———————————

**KONDUROS, J.:** Vicki Rummage (Claimant) appeals the order of the Appellate
Panel of the South Carolina Workers' Compensation Commission (the Appellate
Panel) denying her claim for aggravation of a preexisting psychological condition.
We affirm.

## FACTS/PROCEDURAL BACKGROUND

Claimant worked the third shift as a weaver for BGF Industries. On May 18, 2012,
at approximately 3 a.m., she fell after stumbling backward into a hand truck that

had been placed behind her while she was doffing her weaving machine. Claimant fell backward and struck her head causing a laceration and scrape marks along her neck. She declined going to the hospital at that time, and the wound was closed with glue from the company's first aid supplies. She finished her shift but later stated she had some blurred vision and a headache after the accident. She drove home and returned to work for her next shift two days later. Claimant worked for a week, and her supervisor sent her for evaluation at the local hospital where she had a CT scan that showed normal results.

Dr. John McLeod, III, a workers' compensation physician for BGF Industries and its insurer Great American Alliance Insurance Co. (collectively, Respondents), evaluated Claimant on May 30, 2012, and noted he "suspected some element of concussion." It was noted her medications included Xanax, Percocet, Prinivil, Lopid, Fiorcet, Ambien, and Lorcet. She complained of headaches and soreness in her upper back and neck. A follow-up appointment on June 6, 2012, did not reveal any significant new information.

In September 2012, Claimant was referred to Dr. Jeff Benjamin at Grand Strand Specialty Associates. Claimant admitted a history of migraine headaches to Dr. Benjamin but indicated the ones she was suffering post-injury were different and "quite excruciating." She also complained of fatigue, nausea, blurred vision, spasms in her legs, and mood swings. Dr. Benjamin noted Claimant's symptoms were consistent for closed-head injury. She subsequently complained of fogginess and extreme fatigue. Claimant began physical therapy for her neck and was prescribed Trileptal for headaches and cervical strain. Claimant reported being an "emotional mess" based on the nausea and headaches she was experiencing. Dr. Benjamin gave Claimant trigger point injections,[1] and she received an occipital nerve block. Eventually, in November, Dr. Benjamin indicated he did not think there was much more he could do to assist Claimant except refer her to a pain clinic.

In December of 2012, Claimant began seeing Dr. Daniel Collins, another workers' compensation physician, who treated her for the next three years. His initial note

---

[1] "A trigger point injection (TPI) is an injection that is given directly into the trigger point for pain management. The injection may be an anesthetic such as lidocaine (Xylocaine) or bupivacaine (Marcaine), a mixture of anesthetics, or a corticosteroid (cortisone medication) alone or mixed with lidocaine." Catherine Burt Driver, M.D., *Trigger Point Injection*, MedicineNet (July 30, 2020), https://www.medicinenet.com/trigger_point_injection/article.htm.

reflects a prior medical history of only sinus troubles.  Claimant complained of pain in her neck and head, ringing in her ears, and lightheadedness with slight memory loss.  Dr. Collins prescribed Neurontin, which Claimant indicated she had not tried before; physical therapy; and a speech therapy evaluation.  In a follow-up a month later, Dr. Collins's notes reflect Claimant was attending speech therapy for mild cognitive impairments, physical therapy, and she would begin taking Lyrica.  Claimant was still experiencing significant headaches and neck pain.  In the following months, Dr. Collins noted worsening depression.  He administered trigger point injections for neck pain and Botox injections for headaches.  He prescribed various medications for depression, anxiety, sleep issues, and pain.

Claimant attended speech therapy with Martha Williams at Sandhills Regional Medical Center Rehab Services beginning in January 2013.  After testing, Williams reported Claimant had mild impairment of attention, memory, executive function, and visuospatial skills.  Williams indicated Claimant's fatigue or preoccupation would increase deficits to a moderate level.  Williams worked with Claimant to use different strategies to manage and complete daily tasks.  On Williams's advice, Claimant was using games to aid with focus and cognitive abilities.  By October, Williams noted improvements in language and task management but the therapy had benefitted Claimant as much as possible at the time.

During the course of litigation, it was discovered Dr. Fred McQueen had treated Claimant for years prior to her workplace injury for various conditions.  His notes in the record begin in 2006 and continue to the date of Claimant's injury and a few months beyond.  In 2006, Dr. McQueen noted Claimant suffered from cervical and lumbrosacral disc disease with radiculopathy down her extremities.  Over the course of the next six years, Dr. McQueen prescribed a variety of medications for anxiety, depression, sleep problems, muscle spasms and soreness, headaches, and pain.  He noted the various stressors in her life including caring for her husband and adult son, who both suffered health issues, caring for both parents through the end of their lives, and working multiple jobs.  He noted twice he was concerned with how much longer Claimant would be able to keep working like she was and that her body was breaking down.  Dr. McQueen's notes characterize her at times as having chronic depression and chronic pain, and the notes consistently showed she was taking medication for pain and Xanax, while the prescribing of some other medications seem to fluctuate slightly in being prescribed or filled.

Respondents deposed Claimant in December 2013.  She testified she had a previous workers' compensation claim with a different employer in 2007 that had

been denied, she had not been represented by an attorney in that case, and that it did not progress to a hearing. She also denied being deposed in the prior case. With regard to her treatment and condition after her fall, Claimant testified she complained of neck, arm, back, and leg pain during her visit with Dr. McLeod but was mainly concerned with her head. Claimant testified she then saw Dr. Benjamin and complained of neck and head pain. She next saw Dr. Collins and provided him with a history of Dr. Benjamin's treatment but according to Claimant, Dr. Collins did not ask about any other prior medical history. Claimant acknowledged Dr. McQueen had given her pain medications in the past but claimed she could not remember if it was for her neck and back; she thought it was mainly for her leg. Claimant also acknowledged Dr. McQueen had prescribed depression medications for her in the past when she was experiencing difficult times. She only recalled taking blood pressure medication at the time of her workplace injury. Claimant indicated the problems that began after her fall included headaches, dizziness, ringing in the ears, loss of memory, depression, and neck pain. She stated her neck pain radiated down her arm and she had not had similar neck or arm pain before. Finally, Claimant stated she could no longer manage her housework or caregiving duties and she is very easily confused and distracted. She indicated she sometimes used Facebook to stay in touch with people and played games on the computer for short periods of time as recommended by her speech therapist.

Dr. Collins's deposition was taken March 13, 2014. He stated he was not made aware of a lot of Claimant's prior medical history which concerned him. He stated, "[I]t's really impossible to tell at this point how much or how little the work injury from May 2012 played into symptoms that she had apparently been experiencing for a few years, several years." Dr. Collins noted some of Claimant's current medications were very similar to prior medications, but some of them were new, for example the Botox injections. Dr. Collins stated, "It becomes harder and harder to figure out what is related specifically to the work injury from May and what is possibly an exacerbation of a preexisting or possibly a completely new diagnosis." Dr. Collins noted Claimant's speech issues were new and that he had no doubt she wanted to get better. Dr. Collins opined a long-term physician would be able to give the best information about the progression of her issues.

That same day, March 13, 2014, Dr. McQueen, Claimant's long-time physician completed a form sent to him by Claimant's attorney in January. It indicated Dr. McQueen's opinion, to a reasonable degree of medical certainty, that Claimant's current headaches, frequency of cervical symptoms, and depression were made worse by her fall and were consistent with post-concussive syndrome. He also

opined the treatment for these aggravated symptoms was different and more focused than prior to the fall and she was previously able to continue to work in spite of any preexisting conditions.

Several specialists evaluated Claimant for this case. Tora Brawley, Ph.D., a clinical psychologist and neuropsychologist, evaluated Claimant on May 15, 2014. Claimant's neurocognitive test was discontinued due to interference of her psychiatric symptoms, and Dr. Brawley indicated Claimant could be reevaluated once those were better managed. Dr. Brawley stated "formal assessment of effort did not reveal attempts to malinger." Dr. Amanda Salas, a forensic psychiatrist, evaluated Claimant in April 2015 and issued a report of her findings in September 2015. Dr. Salas indicated Claimant presented as honest and determined, not overly exaggerated or dramatic. In talking with Claimant, Dr. Salas observed she had trouble with landmark dates and some word-finding difficulties. Claimant's husband stated Claimant had gotten lost driving in familiar places and had frequent crying spells. Dr. Salas diagnosed Claimant with Major Depressive Disorder, different than her prior depression. She opined Claimant was not at maximum medical improvement as to mood symptoms and memory impairments, and that she should be stabilized emotionally and then evaluated for cognitive deficit. Finally, Dr. Donna Schwartz Maddox, a psychiatrist with added qualifications in forensic psychiatry, interviewed Claimant in June of 2014 and prepared a report dated April 2016.[2] Dr. Maddox stated Claimant was not malingering and exhibited good effort on the cognitive portion of her mental status exam and did not over endorse symptoms. She noted Claimant's pseudobulbar affect[3] was difficult to feign. Dr. Maddox indicated that, in her opinion, Claimant had increased depression since the accident and needed therapy along with better pharmacological treatment. Claimant's neurocognitive deficits could then be evaluated. Dr. Maddox met with Claimant again in October of 2016 and opined she remained depressed with a flat and tearful affect.

All of the aforementioned providers reviewed Claimant's prior medical history, and Claimant acknowledged prior depression and osteoarthritic pain to each. Claimant

---

[2] No explanation is provided for the delay between the interview and report.
[3] "Pseudobulbar affect . . . is a condition [that is] characterized by episodes of sudden uncontrollable and inappropriate laughing or crying. Pseudobulbar affect typically occurs in people with certain neurological conditions or injuries, which might affect the way the brain controls emotion." Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/pseudobulbar-affect/symptoms-causes.

also complained to each of worsening depression and headache pain in addition to the new symptoms previously mentioned including ringing in the ears, memory loss, speech impairment, low energy, and a general inability to focus.

In April 2015, at Employer's request, Claimant was evaluated at NC Neuropsychiatry in Charlotte, North Carolina.[4] Dr. Thomas Gualtieri administered various tests to Claimant, which primarily involved her responding to questions on a computer. Dr. Gualtieri stated:

> The patient's evaluation today demonstrates a non-credible clinical presentation with dramatic inconsistencies. The patient's overt memory performance and indeed general appearance, fluency and lucidity is quite a variance with her claimed symptomatology. There was clear evidence of symptom exaggeration. There is no reason to believe that her current problems are related to a head injury . . . . [H]er subsequent course is not at all typical of recovery from concussion.

He opined Claimant may suffer from somatization disorder.[5]

Drs. Brawley and Salas both questioned Dr. Gualtieri's choice of tests and methodology. Additionally, they both felt the results of Dr. Gualtieri's testing were invalid because Claimant's significant depressive disorder would interfere with her performance, rendering them unreliable.

Dr. Gualtieri responded to the criticisms of his evaluation. He indicated a main factor in evaluating brain injury was the nature of the initial injury itself and Claimant's description of the injury and delay in seeking treatment rendered this a "non-event." In light of her history, it was not reasonable to assume any current issues were attributable to her fall. Dr. Gualtieri also expressed the validity of his Neuropsych Questionnaire test and noted it was more reliable than just an interview assessment of whether a person was exaggerating or feigning symptoms.

---

[4] The report is actually dated 12/11/14, but Employer indicates that was error. Claimant suggests the erroneous date indicates this was something of a canned report preprepared by Dr. Gualtieri.

[5] "Somatization occurs when psychological concerns are converted into physical symptoms." GoodTherapy, https://www.goodtherapy.org/learn-about-therapy /issues somatization (last visited December 11, 2020).

He cited to numerous journal articles he had authored on the subject. Dr. Gualtieri indicated Claimant had presented herself well and recalled her history fluently although she was occasionally tearful. He stated she did not appear depressed and was not impaired from taking the tests he administered. Additionally, the test scores she received were inconsistent with each other and not consistent with a profile of someone with a traumatic brain injury.

After all the evaluations, and after having provided Claimant's prior medical history in full, Claimant's attorney solicited final opinions—such as the one issued by Dr. McQueen—from Dr. Collins, Dr. Salas, and Dr. Maddox. They all opined to a reasonable degree of medical certainty Claimant was not malingering, presented clinical evidence of depression and anxiety (probably Major Depressive Disorder), had suffered an increase in her psychological issues after her workplace injury, had not reached MMI, and required psychiatric treatment including therapy.

Finally, a hearing on Claimant's case was held in November of 2016. At that time, Claimant acknowledged seeing Dr. McQueen and that she had previously struggled with depression, including taking medication for it. However, she indicated it was nothing she was not able to overcome; she was working, taking care of her responsibilities, and never received psychiatric therapy. Claimant testified she had headaches before her fall but the ones after the accident were different. The nausea accompanying her headaches became worse, and she began experiencing new symptoms including ringing in the ears, speech issues, and dizziness. Claimant indicated she received Botox injections from Dr. Collins and was prescribed medications that helped. However, after Dr. Collins left his practice she "got nothing." At the time of the hearing, she was no longer receiving workers' compensation benefits and was not receiving Botox injections. She indicated her crying and depression were worse, she could not be in a crowd, and did not "have a life" anymore. She also testified her memory issues were new. Claimant further testified she used Facebook at her speech therapist's suggestion as a means to stay in contact with people. Her primary Facebook activity centered on offering prayers to others and commenting on pictures of her grandchildren and their activities. Claimant indicated she had not tried to hide prior issues from her providers.

On cross-examination, Claimant stated she did not go to the doctor immediately after her accident and continued working until August 2012, approximately three months after the injury, although she struggled every day. She acknowledged taking medication for pain and depression since 2005. She admitted her medications had included Xanax, Ambien, and Cymbalta. Claimant acknowledged

receiving medications for pain and depression in 2007 and 2009, while being treated for pain, depression, anxiety, and headaches. Claimant did not recall her specific medications, but again, did not dispute anything reflected in the records. In December 2009, Dr. McQueen was still treating Claimant for chronic pain, migraines, and generalized anxiety disorder (GAD), but according to Claimant these issues were not like they became after the accident. Claimant did not recall how she responded during her deposition to questions about her prior workers' compensation claim except that her husband's insurance had paid for her shoulder surgery which was the subject of the claim. Claimant remembered being treated for pain prior to the accident but she did not know if it was called chronic pain. She admitted Dr. Collins prescribed some of the same medications as Dr. McQueen had previously for depression and anxiety.

The single commissioner denied Claimant's claim, by and large based on her assessment of Claimant's credibility. The single commissioner found Claimant to be "wily and manipulative" and noted her belief Claimant was "using the worker[s'] compensation system for purposes of secondary gain." The single commissioner gave little weight to the medical opinions of Drs. Collins, Brawley, Salas, and Maddox because they had not been provided Claimant's accurate medical history and had based their opinions on Claimant's unreliable self-reporting. The single commissioner gave greater weight to Dr. Gualtieri's opinion that Claimant was untruthful because it "mirrored" her own impressions and "matched the evidence." According to the single commissioner, Dr. Gualtieri "was not fooled or manipulated" by Claimant. Over Claimant's objection, the single commissioner had admitted the order of Commissioner Barry Lyndon from Claimant's prior workers' compensation case. This document was admitted to impeach Claimant's deposition testimony regarding whether a deposition, attorney, or hearing was involved in that case. In her order, the single commissioner indicated she had not relied on Commissioner Lyndon's credibility analysis in making her own assessment in the present case.

Claimant appealed the single commissioner's order raising numerous allegations of error, primarily the single commissioner had ignored the great weight of medical evidence and relied solely on her credibility assessment to deny the claim. At the hearing before the Appellate Panel, Claimant offered the case of *Michau v. Georgetown*, 396 S.C. 589, 723 S.E.2d 805 (2012), and argued Dr. Gualtieri's opinion, which was not stated to a reasonable degree of medical certainty, did not qualify as "medical evidence" sufficient to rebut the medical evidence offered by Claimant. Respondents acknowledged Dr. Gualtieri's opinion was not so stated.

The Appellate Panel affirmed the single commissioner, and its order essentially adopted the single commissioner's order[6] with only a minor deviation. This appeal followed.

**STANDARD OF REVIEW**

"In an appeal from the Commission, [the appellate court] . . . may [not] substitute its judgment for that of the Commission as to the weight of the evidence on questions of fact, but it may reverse when the decision is affected by an error of law." *Jones v. Harold Arnold's Sentry Buick, Pontiac*, 376 S.C. 375, 378, 656 S.E.2d 772, 774 (Ct. App. 2008). "Any review of the [C]ommission's factual findings is governed by the substantial evidence standard." *Lockridge v. Santens of Am., Inc.*, 344 S.C. 511, 515, 544 S.E.2d 842, 844 (Ct. App. 2001). "Accordingly, we limit review to deciding whether the Commission's decision is supported by substantial evidence or is controlled by some error of law." *Jones*, 376 at 378, 656 S.E.2d at 774.

"Substantial evidence is evidence that, in viewing the record as a whole, would allow reasonable minds to reach the same conclusion that the full commission reached." *Lockridge*, 344 S.C. at 515, 544 S.E.2d at 844. "The 'possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Lee v. Harborside Cafe*, 350 S.C. 74, 78, 564 S.E.2d 354, 356 (Ct. App. 2002) (quoting *Palmetto Alliance, Inc. v. S.C. Pub. Serv. Comm'n*, 282 S.C. 430, 432, 319 S.E.2d 695, 696 (1984)).

**LAW/ANALYSIS**

I.   **Medical Evidence—Admission of Dr. Gualtieri's Report**

Claimant contends the Appellate Panel erred in affirming the single commissioner's order because the single commissioner relied on the medical opinion of Dr. Gualteri, although that opinion was not stated to a reasonable degree of medical certainty as required by section 42-9-35 of the South Carolina Code

---

[6] The Appellate Panel unanimously affirmed the single commissioner's order and stated "the same shall constitute the Decision and Order of the Appellate Panel."

(2015) and as discussed in *Michau v. Georgetown*, 396 S.C. 589, 723 S.E.2d 805 (2012).[7]  We conclude this issue is not preserved for our review.

The workers' compensation scheme provides for the manner of review of a single commissioner's order.  "Either party or both may request Commission review of the Hearing Commissioner's decision by filing the original and three copies of a Form 30" and "[t]he grounds for appeal must be set out in detail on the Form 30 in the form of questions presented."  S.C. Code Ann. Regs. 67-701(A)(3) (2012).  "Each question presented must be concise and concern one finding of fact, conclusion of law, or other proposition the appellant believes is in error."  S.C. Code Ann. Regs. 67-701(A)(3)(a).  As to what this requirement means in terms of preservation, our courts have said "[o]nly issues raised to the [Appellate Panel] within the application for review of the single commissioner's order are preserved for review."  *Hilton v. Flakeboard Am. Ltd.*, 418 S.C. 245, 249, 791 S.E.2d 719, 722 (2016).  *See also Ham v. Mullins Lumber Co.*, 193 S.C. 66, 7 S.E.2d 712 (1940) ("[A]ll findings of fact and law by the [single c]ommissioner became and are the law of this case, except only those within the scope of the exception of defendant and the notice given to the parties by the Commission.").  This issue was not raised in Claimant's exceptions to the single commissioner's order. [8]

Claimant first raised the *Michau* argument during her hearing before the Appellate Panel.  Afterward, when reviewing a draft order denying the claim, Claimant, via

---

[7] In *Michau*, the court concluded a medical opinion offered by the opponent of a workers' compensation claim must be stated to a reasonable degree of medical certainty.  *Id.* at 596, 723 S.E.2d at 808.

[8] Claimant argues she raised this issue to the Appellate Panel prior to the hearing by stating in her prehearing memo that there was an absence of "competent evidence which support[ed] the fact finder's determination [Claimant] did not meet her burden of proof."  However, "[e]ach issue raised to the Commission must be done with specificity, not through blanket general exceptions."  *Hilton*, 418 S.C. at 251 n.2, 791 S.E.2d at 722 n.2.  *See also Adcox v. Clarkson Bros. Constr. Co.*, 773 S.E.2d 511, 516 (N.C. Ct. App. 2015) (noting a claimant's very generalized exception to the hearing commissioner's order was "like a hoopskirt—cover[ing] everything and touch[ing] nothing").  Furthermore as to Dr. Gualtieri's opinion specifically, Claimant alleged only that he created the report prior to meeting Claimant, that he used his own diagnostic tests when evaluating Claimant, that he was not qualified to evaluate neuropsychological test data, and that his findings do not align with Claimant's experts' findings.

letter, persuaded the Appellate Panel to include a mention of the *Michau* case and section 42-9-35 in its final order. Therefore, Claimant argues the issue was raised to and ruled on by the Appellate Panel, and the issue is therefore preserved. Indeed, an oft-cited rule of appellate preservation instructs an issue must be raised to and ruled upon to be preserved for appellate review. However, other requirements for preservation cannot be disregarded. To successfully preserve an issue for appellate review, the issue must be: "(1) raised and ruled upon by the trial court; (2) raised by the appellant; (3) raised in a timely manner; and (4) raised to the trial court with sufficient specificity." *S.C. Dep't of Transp. v. First Carolina Corp. of S.C.*, 372 S.C. 295, 302, 641 S.E.2d 903, 907 (2007) (quoting Jean Hoefer Toal et al., *Appellate Practice in South Carolina* 57 (2d ed. 2002)). Therefore, even if we look to general appellate rules of preservation in deciding this issue, we cannot conclude Claimant's argument was "raised in a timely manner." Dr. Gualtieri's report was provided to Claimant prior to the hearing before the single commissioner and any defect it suffered could have been raised before the hearing in front of the Appellate Panel. Consequently, Claimant's point is unpreserved.

## II.  Admissibility of Prior Order

Claimant also maintains the Appellate Panel erred in affirming the single commissioner's order when the single commissioner admitted the prior workers' compensation order of Commissioner Lyndon. We disagree.

Rule 608(b), SCRE, provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness'[s] credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness'[s] character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

In *Mizell v. Glover*, 351 S.C. 392, 570 S.E.2d 176 (2002), a medical malpractice action, the defendant impeached the plaintiff's expert witness with a jury

interrogatory from a prior court case in which the expert was found untruthful. The supreme court considered whether the introduction of the interrogatory was error.

> Essentially, Rule 608(b) allows specific instances of conduct to be *inquired into* on cross, but does not allow those instances of conduct *to be proved* by extrinsic evidence. Reading a jury interrogatory into the record is more than inquiry into past conduct; the purpose of doing so is to prove past conduct. Although [the witness] could have been questioned (and was questioned) about the conduct that was the subject of the suit, he should not have been questioned directly regarding what a previous jury allegedly concluded about such conduct.

*Id*. at 401, 570 S.E.2d at 180-81 (omitted parenthetical).

Additionally, the court found the admission of the interrogatory was not harmless because the issue of the expert's credibility was of paramount consideration in the case. *Id*. at 401, 570 S.E.2d at 181.

In this case, the single commissioner, over Claimant's objection, admitted Commissioner Lyndon's order. Respondents maintain this was done to impeach Claimant's deposition testimony that she had never been deposed before, she did not have an attorney in the prior case, and the prior case did not proceed to a hearing. However, extrinsic proof is not permitted under these circumstances and Rule 608 and, at the very least, the entire order, which commented on Claimant's credibility, was not relevant to impeach as to those specific points. Commissioner Lyndon's order calls Claimant's credibility into question at least five times and gives little weight to Dr. McQueen's opinion based on inconsistencies and contradictions therein. There can be little doubt Respondents offered this evidence in an attempt to establish Claimant had been untruthful in a prior workers' compensation case and, in conformity therewith, was being dishonest in this case. Additionally, the prior order commented on the credibility of Dr. McQueen, a key medical provider in the present case. Undoubtedly, the admission of the order was erroneous.

Nevertheless, the admission of the prior order is subject to a harmless error analysis. *See Muir v. C.R. Bard, Inc.*, 336 S.C. 266, 299, 519 S.E.2d 583, 600 (Ct. App. 1999) (subjecting the erroneous admission of letters in a workers'

compensation case and finding their admission harmless when the information contained therein was cumulative of other admissible evidence). The admission of this evidence is troubling. It speaks directly to the credibility of Claimant and a key medical provider in the case. The single commissioner's credibility findings are the foundation of her decision. Nevertheless, the single commissioner indicates she did not consider Commissioner Lyndon's credibility findings, and as an officer of the court, we give credence to the veracity of that assertion. Additionally and importantly, as will be discussed in Section III, other substantial evidence in the record supports the single commissioner's credibility determination. Therefore, while the admission of the prior order was clearly erroneous, we conclude the error was harmless under the particular facts of this case.

## III. Expert Medical Evidence and Credibility

Finally, Claimant argues the decision of the single commissioner, and its affirmance by the Appellate Panel, was arbitrary and capricious as it was based on lay observations and non-medical evidence as opposed to the medical evidence presented in the case. We disagree.

"The final determination of witness credibility and the weight to be accorded evidence is reserved for the Appellate Panel." *Fishburne v. ATI Sys. Int'l*, 384 S.C. 76, 86, 681 S.E.2d 595, 600 (Ct. App. 2009). "The Appellate Panel is given discretion to weigh and consider all the evidence, both lay and expert, when deciding whether causation has been established. Thus, while medical testimony is entitled to great respect, the fact finder may disregard it if other competent evidence is presented." *Potter v. Spartanburg Sch. Dist. 7*, 395 S.C. 17, 23, 716 S.E.2d 123, 126 (Ct. App. 2011).

In a case brought under section 42-9-35, the burden is on the claimant to produce medical evidence to establish a claim for the exacerbation of a preexisting condition. *See* §42-9-35(A) ("The employee shall establish by a preponderance of the evidence, including medical evidence, that: (1) the subsequent injury aggravated the preexisting condition or permanent physical impairment . . . ."). However, this does not require the fact finder to ignore medical evidence that is not expert opinion, other lay evidence, or the credibility of the Claimant. In some instances the medical evidence and credibility determination can be tidily separated. For example, a recent case from the supreme court, *Crane v. Raber's Disc. Tire Rack*, 429 S.C. 636, 643, 842 S.E.2d 349, 352 (2020), discussed the interplay of credibility determinations and medical evidence in workers' compensation cases.

The commission often makes findings of fact based on credibility determinations

. . . .

The reason we consistently affirm these findings derives from a principle that applies beyond credibility to all factual determinations of the commission: "an award must be founded on evidence of sufficient substance to afford a reasonable basis for it." When the commission's factual determination is "founded on evidence of sufficient substance," and the evidence "afford[s] a reasonable basis" for the commission's decision in the case, the evidence meets the "substantial evidence" standard and we are bound by the decision. This point is illustrated in the hundreds of cases in which our appellate courts have affirmed factual determinations by the commission.

*Crane*, 429 S.C. at 643, 842 S.E.2d at 352 (quoting *Hutson v. S.C. State Ports Auth.*, 399 S.C. 381, 387, 732 S.E.2d 500, 503 (2012)).

In cases where credibility is not a substantial issue, however, even a valid credibility finding is not a proper basis for deciding a question of fact. This case illustrates that point. Even if [the claimant] was untruthful in his testimony at the hearing, his claims for future medical care, temporary total disability, and permanent impairment caused by hearing loss are based on objective medical evidence. The opinions of his treating physicians that he suffers from severe to profound hearing loss as a result of his work-related accident are similarly based on objective medical evidence. There is little in [the claimant]'s medical records—or anywhere in the record before us—that indicates [the claimant]'s credibility reasonably and meaningfully relates to whether he actually suffered hearing loss on [the date of the incident].

> To make a proper review of a factual determination by the commission based on credibility, the appellate court must not only understand that the commission relied on the credibility finding; the court must also be able to understand the reasons the evidence supports the credibility finding, and must be able to understand the reasons credibility supports the commission's decision. In most cases, this is obvious from context.

*Id.* at 646-47, 842 S.E.2d at 354.

In this case, credibility was a substantial issue because the deterioration in Claimant's psychological condition was not objectively measureable like the employee's hearing loss in *Crane*. Therefore, the Appellate Panel could have properly given less weight to Claimant's doctor's opinions if it believed Claimant was untruthful in her self-reporting of symptoms or her presentation. *See Tiller v. Nat'l Health Care Ctr. of Sumter*, 334 S.C. 333, 340, 513 S.E.2d 843, 846 (1999) ("Expert medical testimony is designed to aid the Commission in coming to the correct conclusion; therefore, the Commission determines the weight and credit to be given to the expert testimony."); *see also Fishburne*, 384 S.C. at 87, 681 at 601 (noting the single commissioner gave less weight to a physician's opinion "because of the objective evidence and [her] own observations and impressions at the hearing," which included finding the claimant was not credible).

Although the single commissioner's unforgiving assessment of Claimant's credibility was unduly harsh and unwarranted, the record is not without substantial evidence that Claimant lacked credibility, even in the absence of Commissioner Lyndon's order. In particular, in her deposition, Claimant denied some relatively major prior issues entirely. For example, she denied any real neck problems or dizziness prior to the accident even though she had complained of both many times according to Dr. McQueen's notes and had undergone a CT scan prior to her injury for "headaches and dizziness." She characterized her depression as manageable and somewhat episodic although Dr. McQueen and/or his nurse practitioner characterized it as chronic and major at different times. Claimant appeared to downplay the frequency and intensity of prior headaches in spite of McQueen's notes indicating she suffered from tension headaches, sinus headaches, and later, migraine headaches. With respect to medications, Claimant frequently indicated she did not remember whether she was taking a particular medication at a given time, although she did not deny taking medicines generally. Her greatest misleading statement as to specific medications was that she was only taking

"something for blood pressure" at the time of her fall when the records reveal she had been taking Percocet and Xanax consistently for many years and other medications with frequency. The record also demonstrated two occasions in which Claimant had been dishonest with providers regarding the filling of her pain medications. The single commissioner also relied on her lay observations of Claimant's demeanor.

Claimant's medical records demonstrated a long-standing history of serious psychological issues. Additionally, the medical evidence showed Claimant did not lose consciousness when she fell and two weeks postfall, she exhibited no "focal neurological deficits." Dr. Gualtieri's report also indicated Claimant's injury was not the type that should have produced the issues she was suffering and that in his opinion, Claimant was malingering.

In sum, substantial evidence in the record supports the Commission's decision. Claimant's medical experts' opinions were substantially weakened in light of the credibility findings of the Appellate Panel as the opinions rely, at least in part, on an unexaggerated presentation of symptoms. The medical evidence presented by Respondents established Claimant had long-standing significant psychological issues prior to her workplace fall and the fall itself may not have been the source for any deterioration in her condition. Ever mindful of our limited standard of review in workers' compensation cases, the order of the Appellate Panel denying Claimant's compensation is

**AFFIRMED.**

**LOCKEMY, C.J., concurs.**

**MCDONALD, J., concurring in result only.**