## 17613

Annie Laura GLENN, Plaintiff v. COLUMBIA SILICA SAND COMPANY, Employer, and Dixie Fire and Casualty Company, and Pennsylvania Threshermen and Farmers' Mutual Casualty Insurance Company, Defendants, of whom Dixie Fire and Casualty Company is, Appellant, and Pennsylvania Threshermen & Farmers' Mutual Casualty Insurance Company and Annie Laura Glenn are, Respondents.

(112 S. E. (2d) 711)

14

*Messrs. Whaley & McCutchen* and *Hoover C. Blanton,* of Columbia, *for Appellant,*

*Messrs. W. C. Boyd* and *Boyd, Bruton & Lumpkin,* of Columbia, *for Respondent,*

February 9, 1960.

LEGGE, Justice.

Colie B. Glenn, an employee of Columbia Silica Sand Company, died on April 4, 1958, of silicosis. He had been in the employ of that company for about ten years, during the last four of which he worked in the drying room, where the sand is dried by heat and is screened for removal of trash and for grading. On September 30, 1957, he was hospitalized, diagnosis on his admission disclosing fever, asthmatic bronchitis, and persistent nosebleed. While in the hospital, x-ray examination of his chest resulted in diagnosis, for the first time, of silicosis. The record before us indicates that although his salary was paid through October 10, 1957, he had been unable to work regularly after August 29, 1957; and it is uncontraverted that from the time of the diagnosis in October, 1957, he was totally disabled.

It is conceded that Mr. Glenn's death resulted from silicosis, an occupational disease peculiar to and contracted during his employment, and that his widow is entitled to compensation under the South Carolina Workmen's Compensation Law. The controversy here is between two insurers, the respondent Pennsylvania Threshermen and Farmers' Mutual Casualty Insurance Company, which covered the employer from May 19, 1950, through May 18, 1957, and the appellant Dixie Fire and Casualty Company, which covered on and after May 19, 1957, as to which of them must pay the award or whether and how its payment should be apportioned between them.

The hearing commissioner, having found that the last injurious exposure was on or about October 1, 1957, concluded as a matter of law that liability should be appor-

tioned on the basis of length of coverage during the year ending on that date, *i. e.*: that Pennsylvania should pay such proportion, 63.3%, of the award, as the period of its coverage (October 1, 1956, through May 18, 1957, or 7 3/5 months) bore to that full year; and that Dixie should pay 36.7% based on its coverage during the period May 19-October 1, 1957, or 4 2/5 months. Upon review by the full commission, a majority reversed, holding that Dixie should bear the entire loss. From an order of the circuit court affirming this holding, Dixie appeals.

Dr. Pitts, who was Mr. Glenn's personal physician, testified to his treatment of Mr. Glenn, prior to the latter's hospitalization on September 30, 1957, as follows:

November 2, 1954: Mr. Glenn came to him, suffering from asthmatic bronchitis resulting from inhalation of dust. Condition improved under treatment and patient returned to work November 9. No *x*-ray was taken. Claim for workmen's compensation benefits for this period of disability, October 28-November 9, 1954, was filed and paid.

June 18, 20 and 21, 1955: Treatment for asthma and an ear infection. No claim for compensation.

November 9, 10, 17 and 18, 1955: Recurrence of asthma, with some fever. Administered antibiotics. No claim for compensation.

May 8, 1957: Same symptoms, in mild form. No fever. Penicillin. No claim for compensation.

August 8, 1957: Same symptoms. Some fever. No claim for compensation.

The South Carolina Workmen's Compensation Law is codified as Title 72 of the 1952 Code. Chapter 5 of that Title (Sections 72-251 through 72-269) relates to occupational diseases. Pertinent here are Sections 72-252, 72-253, 72-255 and 72-256, which read as follows:

"72-252. As used in this chapter, 'disablement' means the event of an employee's becoming actually incapacitated, partially or totally, because of an occupational disease, from

performing his work in the last occupation in which injuriously exposed to the hazards of such disease, 'partial disability' means the physical inability to continue work in such occupation only and 'total disability' means the physical inability to perform work in any occupation. The disablement and disability of an employee from an occupational disease shall be determined as provided in this chapter."

"72-253. When employer and employee are subject to the provisions of this Title, the disablement or death of an employee resulting from an occupational disease shall be treated as an injury by accident and the employee, or in case of death his dependents, shall be entitled to compensation as for an injury under this Title, except as otherwise provided in this chapter; and the practice and procedure prescribed in this Title shall apply to all proceedings under this chapter, except as otherwise provided in this chapter. In no case shall an employer be liable for compensation for an occupational disease unless such disease was contracted by the employee while in the employ of the employer as a direct result of the employment."

"72-255. No compensation shall be payable for any pulmonary disease arising out of the inhalation of organic or inorganic dusts unless the claimant shall have been exposed thereto by his employment for a period of at least one year and unless he suffers a total disability therefrom."

"72-256. Neither an employee nor his dependents shall be entitled to compensation for disability or death from an occupational disease unless such disease was contracted within one year after the last exposure to the hazard peculiar to his employment which caused the disease, save that in the case of a pulmonary disease arising out of the inhalation of organic or inorganic dusts the period shall be two years."

Appellant argues that the award should be either:

1. paid by Pennsylvania alone, as the insurer "when the disease first manifested itself in 1954"; or

2. apportioned between Pennsylvania and Dixie in proportion to the time that each was on the risk during one of three periods, *viz:*

(a) May 19, 1950 (when Pennsylvania's coverage began) to October 1, 1957 (date of diagnosis and total disability) or,

(b) October 28, 1954 ("when the disease first manifested itself") to October 1, 1957; or, as held by the hearing commissioner,

(c) October 1, 1956 to October 1, 1957 (last year of exposure).

These contentions in themselves suggest the difficulty of evolving a stable and workable rule for determining liability as between successive insurers in cases of occupational disease, such as silicosis, where disability develops gradually from long exposure to the occupational hazard. In our opinion none of the suggested formulae are soundly applicable here. We shall discuss them briefly, as numbered above.

1. This argument is based upon the assumption that the temporary disability in 1954 (October 28-November 9) from "asthmatic bronchitis resulting from inhalation of dust" was the "first manifestation" of silicosis. But it is clear from Dr. Pitts' testimony that he did not consider or diagnose that illness as resulting from silicosis. In other words, inhalation of dust had not at that time progressed to the point where it could be said with reasonable certainty that the disease of silicosis was present. The inference that appellant would draw from Dr. Pitts' testimony is too speculative.

2. (a) In the suggested prorating from the inception of Pennsylvania's coverage, May 19, 1950, liability would commence with exposure, not disability. But, as we have held in compensation cases other than those arising from occupational diseases, compensability, and therefore liability, is founded upon disability, not injury. *Keeter v. Clifton Mfg. Co.,* 225 S. C. 389, 82 S. E. (2d) 520. Such too, we think, is the clear intendment of the Code sections before quoted, relating to occupational diseases.

2. (b)··Here again appellant's formula is based upon the speculative· inference from the medical testimony to which we·have referred under 1.

2.· (c)· The hearing commissioner's holding that payment of the award should be apportioned on the respective periods of coverage during the last year of exposure is referable, as stated by·him, to Section 72-255. But the one-year period mentioned in that section simply limits the right to compensation by requiring, as a condition precedent to it, exposure for one year. The key to liability under that section is not the exposure, but the "total disability therefrom". In the case at bar we note from Dr. Pitts' testimony as hereinbefore summarized that, except for a mild attack of asthma, without fever, on May 8, 1957, and another, with fever, on August 8, 1957, there was no disability between November 18, 1955 and September 30, 1957.

The code provisions hereinbefore quoted, relating to occupational diseases, are part of the South Carolina Workmen's Compensation Law, a comprehensive statute embodied in Title 72 of the 1952 Code. They should be construed together, and in relation to the other provisions of that Title to which reference is made in Section 72-253, and which deal with compensation for disability or death resulting from accident arising out of and in the course of the employment. *Cf. Creech v. South Carolina Public Service Authority,* 200 S. C. 127, 20 S. E. (2d) 645; *Bradford v. Byrnes,* 221 S. C. 255, 70 S. E. (2d) 228. So construing them we conclude that in occupational disease cases compensability accrues when disability (in case of pulmonary disease arising out of the inhalation of organic or inorganic dust, total disability) or death occurs.

Discussing the question of liability as between successive insurers in such cases, Professor Larson, in his Workmen's Compensation Law, Volume 2, Section 95.21 says:

"In the case of occupational disease, liability is most frequently assigned to the carrier who was on the risk when

the disease resulted in disability, if the employment at the time of disability was of a kind contributing to the disease \* \* \*. Occupational disease cases typically show a long history of exposure without actual disability, culminating in the enforced cessation of work on a definite date. In the search for an identifiable instant in time which can perform such necessary functions as to start claim periods running, establish claimant's right to benefits, and fix the employer and insurer liable for compensation, the date of disability has been found the most satisfactory. Legally, it is the moment at which the right to benefits accrues; as to limitations, it is the moment at which in most instances the claimant ought to know he has a compensable claim; and, as to successive insurers, it has the one cardinal merit of being definite, while such other possible dates as that of the actual contraction of the disease are usually not susceptible to positive demonstration."

We note, in passing, that where the employment at the time of disability was not of a kind contributing to the disease, the general rule is that liability for the entire compensation is that of the employer, and consequently of the carrier, at the time of the employee's last exposure causally related to the disease. Larson, Volume 2, Section 95.22; *Commissioner of Taxation and Finance v. Nu-Art Advertising Co.,* 1936, 271 N. Y. 112, 2 N. E. (2d) 280, 104 A. L. R. 1209; *Pacific Employers Insurance Co. v. Industrial Commission of Utah,* 1945, 108 Utah 123, 157 P. (2d) 800; *Travelers Insurance Co. v. Cardillo,* 2 Cir., 1955, 225 F. (2d) 137; *Monti Marine Corporation v. Quigley,* D. C. E. D. N. Y. 1958, 167 F. Supp. 690.

*Travelers Insurance Co. v. Cardillo, supra,* was concerned with claims for compensation, under the Longshoremen's and Harbor Worker's Compensation Act, 33 U. S. C. A. § 901 *et seq.,* for impairment of hearing due to occupational exposure, and with the question which carrier or carriers should pay the awards. That Act, like ours, made no provision for apportionment. The court, concluding from the

legislative history of the Act that the Congress had deliberated upon and rejected the idea of apportionment between successive employers, held that the same considerations that determined responsibility there should also determine liability as between successive carriers.

In *Underwriters at Lloyds, London v. Alaska Industrial Board*, D. C. Alaska 1958, 160 F. Supp. 248, the court, pointing out that, although the idea of apportionment had been adopted in some states by statute, in only one (California) had it been adopted by judicial decision, declared that it would not write apportionment into the Alaska Workmen's Compensation Law, A. C. L. A. 1949, § 43-3-1 *et seq.;* and, following *Travelers Insurance Co. v. Cardillo, supra,* held that the carrier which was on the employer's risk on the last day of the employee's harmful exposure to tuberculosis was liable for compensation for disability caused by that disease.

Neither the idea of "apportionment" nor the rule of "last injurious exposure" is embodied in our Workmen's Compensation Law. Section 72-256, requiring, as a condition precedent to compensability, that the disease shall have been "contracted" within a specified time after the "last exposure", is not involved here.

Section 72-253 declares the event to be treated "as an injury by accident" to be not contraction of the occupational disease, but "disablement or death" resulting from it. Section 72-303 bars compensation under Title 72 "unless a claim is filed with the Commission within one year after the accident". To construe these sections as meaning that the liability of employer and carrier arises when an occupational disease is "contracted" would be to usurp the legislative function. In addition, to construe the word "contracted", so written in, as referring to a point in time prior to that when, medically, the disease has been definitely found to be present, would be to inject uncertainty into the calculation of the period limited for the filing of claims and might well deny the benefit of the law to an employee who, having no occasion

to realize that there is anything wrong with him, nevertheless, since the disease is actually present within him, though unperceived, may be said to have "contracted" it.

In the case at bar, total disablement occurred contemporaneously with definite medical determination, for the first time, in October, 1957, of the existence of the disease. The majority of the commission correctly construed the statute as imposing liability upon Dixie, which was the carrier at that time; and we concur in the circuit court's affirmance of the award.

Affirmed.

Stukes, C. J., and Taylor, Oxner and Moss, JJ., concur.