# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

South Carolina Workers' Compensation Commission,
Respondent,

v.

WestPoint Home, LLC, Appellant.

Appellate Case No. 2023-001663

―――――――――

Appeal From Richland County
Alison Renee Lee, Circuit Court Judge

―――――――――

Opinion No. 6121
Heard March 13, 2025 – Filed September 17, 2025

―――――――――

## REVERSED AND REMANDED

―――――――――

Matthew Todd Carroll, of Womble Bond Dickinson (US)
LLP, of Columbia, and Herbert Beigel, of Tucson,
Arizona, both for Appellant.

Michael H. Montgomery, of Montgomery Willard, LLC,
and James Keith Roberts, of the South Carolina Workers'
Compensation Commission, both of Columbia, for
Respondent.

―――――――――

**TURNER, J.:**  WestPoint Home (WestPoint) appeals an order of the circuit court
finding the South Carolina Workers' Compensation Commission (the Commission)
could indefinitely retain the $1.8 million WestPoint deposited as security for
potential workers' compensation claims filed by former employees after its
predecessor corporation entered bankruptcy.  On appeal, WestPoint argues the

circuit court erred in finding (1) the Commission was justified in withdrawing the entire deposit and transferring it to an account with the State Treasurer even though the pending claims never equaled the total deposit amount and (2) the Commission could continue to retain the unused portion of the deposit indefinitely even though the statute of repose for new claims had expired. WestPoint also contends it was entitled to collect prejudgment interest. We reverse as to the first two issues and remand for further proceedings regarding the prejudgment interest issue.

**FACTS**

WestPoint is the corporate entity that ultimately emerged out of the dissolution of WestPoint Stevens, a South Carolina textile manufacturer that went into bankruptcy and closed in August 2005. WestPoint Stevens was a self-insured employer for purposes of its workers' compensation liabilities in South Carolina. In conjunction with the purchase of WestPoint Stevens's assets, WestPoint deposited $1.8 million in a private account to fund an irrevocable letter of credit as security for potential workers' compensation claims against WestPoint Stevens.

In 2013, WestPoint sought to reduce the security amount held by the Commission. Eventually, in April 2014, the Commission filed a declaratory judgment action seeking clarification as to whether WestPoint was entitled to receive certain information—specifically, how much of its $1.8 million deposit had been disbursed and any actuarial reports projecting how much should remain in reserve—arguing that the information was confidential and could not be disclosed outside the agency. WestPoint filed a counterclaim seeking an accounting and a declaration that it was entitled to the information as well as "all monies owed and improperly retained" by the Commission.

The parties filed various motions, and the circuit court eventually ordered the Commission to disclose the number of open claims asserted against WestPoint's funds and the balance of the funds remaining on deposit. The Commission responded that it still held approximately $1.16 million of WestPoint's initial deposit and there were no open claims. WestPoint then sought a "loss-run report" to show how many claims had been paid plus "an actuarial analysis to determine how much security, if any, would be needed for potential future claims." WestPoint subpoenaed records from Key Risk, the third-party administrator that had handled and adjusted WestPoint Stevens's claims, which showed the last payment on a claim had been made on May 7, 2008. The Commission also disclosed its actuarial formula used to calculate the amount of surety required from self-insurers, as well as records showing the Commission held a balance of $1.7

million from the drawdown of the letter of credit—$1.16 million in principal plus interest.

At trial, Gary Cannon, the Commission's executive director, testified regarding the Memorandum of Understanding (MOU) governing the letter of credit between WestPoint Stevens and the Commission. The MOU stated, "[T]he Commission may at any time draw on the letter of credit, if needed, to pay any Workers' Compensation claim or claims of administration expense which are the responsibility of the employer." The MOU also stated that "if the Commission is notified that the letter of credit is being cancelled or will not be renewed and a new letter of credit . . . is not filed with the Commission, the Commission may at its discretion draw on the letter credit." Cannon testified the Commission drew down the entire $1.8 million balance of the letter of credit on August 17, 2005. He acknowledged that, at the time of the withdrawal, the pending claims did not total $1.8 million, and, as of the date of trial, the Commission had "not needed $1.8 million to pay claims of former WestPoint Stevens employees."

However, Cannon explained that the Commission nonetheless drew on the letter of credit because WestPoint Stevens had notified the Commission that "no further payments [would] be made with respect to workers' compensation claims asserted" against it. Cannon stated the Commission was aware that WestPoint had assumed the obligations of WestPoint Stevens regarding the letter of credit and clarified that he was not asserting that the letter of credit had ever been cancelled or terminated. Rather, he asserted WestPoint had not truly "step[ped] into the shoes of WestPoint Stevens because they disclaimed liability."[1] Therefore, the Commission felt it "had to draw down on the letter of credit to ensure that the funds would be set aside for any future claims to be paid." Cannon agreed, however, that no WestPoint Stevens claim had been filed or paid in more than a decade, and based on the Commission's own actuarial formula used to calculate the reserve funds needed from a self-insured employer, WestPoint's surety amount dropped to $0 starting in 2012.

Cannon explained the Commission was specifically concerned about "the potential asbestos claims that could have been filed." He asserted that the Commission had a duty to "look at the potential claims coming in . . . 40, 50 years later" and to

---

[1] This appears to be a reference to a line in the August 15, 2005 letter stating that "workers' compensation liabilities asserted against [WestPoint Stevens] were not liabilities assumed by" the purchase of WestPoint Stevens's assets in the bankruptcy case.

ensure that money is available to pay those potential claims.  He testified that although the statute of repose is two years from the last exposure, "[a]ny latent claim" is governed by the statute of limitations which allows claims to be filed "two years from the date of diagnosis."

Christopher Burkhalter, the Commission's expert witness, testified six WestPoint Stevens locations were "included on a list of jobsites where asbestos exposure was known to have occurred."  Burkhalter further explained the average latency period for asbestos-related diseases range[d] from 10 to 50 years."  He stated that if a twenty-year-old working for WestPoint Stevens was exposed in 2005, there "would be a 96.8 percent chance that [mesothelioma] would not have manifested" at the time of trial.  Burkhalter testified it was "certainly" possible that former WestPoint Stevens employees were "alive and undiagnosed," and that the "lack of claims in recent years" had "miniscule" bearing on the likelihood of future claims.

The circuit court found the Commission "did not act improperly when it drew down the entire letter of credit in 2005" because WestPoint stated that no further payments would be made regarding claims asserted against it, and, at that time, there were dozens of active claims pending.  Thus, the circuit court reasoned, the Commission "was unquestionably entitled to draw down funds to pay those claims," and was entitled to draw down the entire amount because there was "no evidence the Commission knew how much money was needed to satisfy those claims."  Additionally, the circuit court found that the interplay of the statute of limitations and the statute of repose "may narrow the pool of potential successful claims, [but did] not eliminate it," and thus, the Commission was justified in continuing to retain WestPoint's funds due to the possibility of future claims.  This appeal followed.

## ISSUES ON APPEAL

1.  Did the circuit court err in determining the Commission was justified in withdrawing WestPoint's deposit and transferring it to an account with the State Treasurer even though there were no claims pending up to the full deposit amount?

2.  Did the circuit court err in finding the Commission could continue to retain the unused portion of WestPoint's deposit even though the statute of repose for new claims had expired?

3. Is WestPoint entitled to collect prejudgment interest on the amount owed to it by the Commission?

## STANDARD OF REVIEW

"In order to determine the standard of review to apply, we must look to the kind of action in which the issue involved would have been decided if there were no declaratory judgment procedure." *Barnacle Broad., Inc. v. Baker Broad., Inc.*, 343 S.C. 140, 146, 538 S.E.2d 672, 675 (Ct. App. 2000). "We review questions of statutory interpretation de novo." *Books-A-Million, Inc. v. S.C. Dep't of Revenue*, 437 S.C. 640, 642, 880 S.E.2d 476, 477 (2022).

## LAW/ANALYSIS

"The cardinal rule of statutory interpretation is to ascertain and effectuate the legislative intent whenever possible." *Mitchell v. City of Greenville*, 411 S.C. 632, 634, 770 S.E.2d 391, 392 (2015). "With any question regarding statutory construction and application, the court must always look to legislative intent as determined from the plain language of the statute." *Peake v. S.C. Dep't of Motor Vehicles*, 375 S.C. 589, 597-98, 654 S.E.2d 284, 289 (Ct. App. 2007). "The text of a statute is considered the best evidence of the legislative intent or will." *Id.* at 598, 654 S.E.2d at 289. "In interpreting a statute, the language of the statute must be read in a sense that harmonizes with its subject matter and accords with its general purpose." *Town of Mt. Pleasant v. Roberts*, 393 S.C. 332, 342, 713 S.E.2d 278, 283 (2011). "[S]tatutes must be read as a whole and sections which are part of the same general statutory scheme must be construed together and each given effect, if it can be done by any reasonable construction." *Hudson ex rel. Hudson v. Lancaster Convalescent Ctr.*, 407 S.C. 112, 124-25, 754 S.E.2d 486, 492-93 (2014); *see also Hodges v. Rainey*, 341 S.C. 79, 88, 533 S.E.2d 578, 583 (2000) ("Statutes dealing with the same subject matter must be reconciled, if possible, so as to render both operative.").

"The canon of construction '*expressio unius est exclusio alterius*' or '*inclusio unius est exclusio alterius*' holds that 'to express or include one thing implies the exclusion of another, or of the alternative.'" *Riverwoods, LLC v. County of Charleston*, 349 S.C. 378, 384, 563 S.E.2d 651, 655 (2002) (quoting *Hodges*, 341 S.C. at 86, 533 S.E.2d at 582). "Where there is an express exception in a statute, all other exceptions which are not expressly set forth are e[x]cluded." *Vernon v. Harleysville Mut. Cas. Co.*, 244 S.C. 152, 157, 135 S.E.2d 841, 844 (1964). "The

inclusion of one exception amounts to an affirmation of the applicability of the statute's provision to all other cases which are not excepted." *Id.*

**Withdrawal of Deposit**

We hold the Commission improperly drew down the letter of credit because the funds were not needed for the payment of any pending claims.[2]

The South Carolina Workers' Compensation Act allows corporations to "self-insure" their workers' compensation liability. *See* S.C. Code Ann. § 42-5-20(A)(1) (2015 & Supp. 2024) ("Every employer who accepts the provisions of this title relative to the payment of compensation shall insure and keep insured his liability thereunder . . . or shall furnish to the [C]ommission satisfactory proof of his financial ability to pay directly the compensation in the amount and manner and when due . . . ."). One of the ways the Commission permits a self-insurer to prove its ability to pay potential claims against it is through an MOU and irrevocable letter of credit. *See* S.C. Code Ann. Regs. 67-1507(A) (2006). "Once an irrevocable letter of credit is established, it may be revoked only with the consent of the Commission." S.C. Code Ann. Regs. 67-1507(D) (2006). "The Commission may exercise the letter of credit at any time if the proceeds are needed for payment of a claim that occurred during the self-insured period." S.C. Code Ann. Regs. 67-1507(D)(5) (2006).

Here, the regulation at issue plainly states that the Commission may draw down the letter of credit "*if the proceeds are needed for payment of a claim*" or if "the self-insurer *fails to replace the letter with another accepted proof of compliance* [with the surety requirement]." S.C. Code Ann. Regs. 67-1507(D)(4)-(5) (2006) (emphases added). The MOU contained similar language stating that the Commission could "draw on the letter of credit, *if needed, to pay any Workers' Compensation claim* or claims of administration expense which are the

---

[2] We decline to consider the Commission's argument that WestPoint is essentially asserting that it "breached an implied contract created by the MOU" and breach of contract actions have a three-year statute of limitations. *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 421, 526 S.E.2d 716, 724 (2000) (explaining that a respondent is not required "to present an issue to the lower court in order to raise it as an additional sustaining ground," but an appellate court is unlikely to rely on such a ground); *id.* ("Stated another way, the respondent may raise an additional sustaining ground that was not even presented to the lower court, but the appellate court is likely to ignore it.").

responsibility of the employer."  It also stated that if the Commission "is notified that the [l]etter of [c]redit is being cancelled or will not be renewed and a new letter of credit or surety bond . . . is not filed . . ., the Commission may, at its discretion, draw on the [l]etter."

However, on the date the Commission drew down the letter, it did not need the full $1.8 million balance to pay pending claims, and in fact, WestPoint has never had $1.8 million in claims pending against it.  Moreover, the Commission was aware that WestPoint had secured WestPoint Stevens's obligations under the letter of credit, and at no time did the Commission believe the letter had been revoked or cancelled.  Further, pursuant to the applicable regulations, the Commission's permission would have been required for the *irrevocable* letter of credit to be cancelled.  *See* S.C. Code Ann. Regs. 65-1507(D) (2006).

Accordingly, we hold the circuit court erred in determining the Commission was justified in drawing down the entire $1.8 million letter of credit, and we reverse the circuit court as to this issue.  *See Peake*, 375 S.C. at 597-98, 654 S.E.2d at 289 ("With any question regarding statutory construction and application, the court must always look to legislative intent as determined from the plain language of the statute."); *Murphy v. S.C. Dep't of Health & Envtl. Control*, 396 S.C. 633, 639, 723 S.E.2d 191, 195 (2012) ("Regulations are interpreted using the same rules of construction as statutes."); *Brown v. Bi–Lo, Inc.*, 354 S.C. 354 S.C. 436, 440, 581 S.E.2d 836, 838 (2003) (explaining that an agency's interpretation of its own regulation is usually entitled to deference, but if "the plain language of the statute is contrary to the agency's interpretation, the [c]ourt will reject the agency's interpretation").

**Return of Deposit**

WestPoint asserts that the Commission has wrongfully retained the unused principal of $1.16 million because "the repose period for any new claims has closed."  The Commission argues there is no statute of repose that would prohibit new claims against WestPoint Stevens, and it needs to retain the funds because of the possibility that "latent" claims involving asbestos exposure and/or pulmonary disease could arise in the future.  We hold WestPoint is entitled to the return of its unused funds.

"A statute of limitations is a procedural device that operates as a defense to limit the remedy available from an existing cause of action."  *Capco of Summerville, Inc. v. J.H. Gayle Const. Co.*, 368 S.C. 137, 142, 628 S.E.2d 38, 41 (2006).  A statute of repose, on the other hand, "creates a substantive right in those protected

to be free from liability after a legislatively determined period of time." *Id.* "A statute of repose differs from a statute of limitations" because the "expiration of the time extinguishes not only the legal remedy but also all causes of action, including those which may later accrue as well as those already accrued." *Id.* (quoting *School Bd. of the City of Norfolk v. U.S. Gypsum*, 360 S.E.2d 325, 327-28 (Va. 1987)). Thus, a statute of repose "bar[s] any suit that is brought after a specified time since the defendant acted . . . even if this period ends before the plaintiff has suffered a resulting injury." *Id.* (alteration in original) (quoting *Black's Law Dictionary* 1451 (8th Ed. 2004)).

Section 42-15-40 of the South Carolina Code (2015) is the statute of limitations in workers' compensation cases. *See Rogers v. Spartanburg Reg'l. Med. Ctr.*, 328 S.C. 415, 418, 491 S.E.2d 708, 710 (Ct. App. 1997) (characterizing section 42-15-40 as a statute of limitation requiring any claim "to be filed within two years after an accident"). It states,

> The right to compensation under this title is barred unless a claim is filed with the commission within two years after an accident, or if death resulted from the accident, within two years of the date of death. However, for occupational disease claims the two-year period does not begin to run until the employee concerned has been diagnosed definitively as having an occupational disease and has been notified of the diagnosis.

§ 42-15-40. Section 42-11-70 of the South Carolina Code (2015) states,

> Neither an employee nor his dependents shall be entitled to compensation for disability or death from an occupational disease, except that due to exposure to ionizing radiation, unless such disease was contracted within one year after the last exposure to the hazard peculiar to his employment which caused the disease, save that in the case of a pulmonary disease arising out of the inhalation of organic or inorganic dusts the period shall be two years.

In workers' compensation cases, "[t]he term 'contracted' is a term of art which has been defined for compensation purposes in occupational disease cases as

'disablement or death.'" *Vespers v. Springs Mills, Inc.*, 276 S.C. 94, 97, 275 S.E.2d 882, 884 (1981). Accordingly, "in occupational disease cases[,] compensability accrues when disability or death occurs." *Id.* (quoting *Drake v. Raybestos-Manhattan, Inc.*, 241 S.C. 116, 121, 127 S.E.2d 288, 291 (1962)); *see also Glenn v. Columbia Silica Sand Co.*, 236 S.C. 13, 21, 112 S.E.2d 711, 715 (1960) ("[T]he event to be treated 'as an injury by accident' [is] not contraction of the occupational disease, but 'disablement or death' resulting from it.").

When the term "disablement or death" is substituted for "contracted," section 42-11-70 reads as follows:

> Neither an employee nor his dependents shall be entitled to compensation for disability or death from an occupational disease, except that due to exposure to ionizing radiation, unless such disease [*caused disablement or death*] within one year after the last exposure to the hazard peculiar to his employment which caused the disease, save that in the case of a pulmonary disease arising out of the inhalation of organic or inorganic dusts the period shall be two years.

Thus, we hold section 42-11-70 is a statue of repose because it sets a time limitation on an event—i.e., the employee's last exposure to the hazard—separate from the event which triggers the accrual of the cause of action—i.e., diagnosis and notification.[3] *See School Bd.*, 360 S.E.2d at 327 ("The time limitation in [a statute of repose] begins to run from the occurrence of an event unrelated to the accrual of a cause of action . . . ."); *Hodges*, 341 S.C. at 85, 533 S.E.3d at 581 ("Where the statute's language is plain and unambiguous, and conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the court has no right to impose another meaning."); *id.* at 88, 533 S.E.2d at 583 ("Statutes dealing with the same subject matter must be reconciled, if possible, so as to render both operative.").

Moreover, section 42-11-70 contains an exception to its general rule—those diseases caused by exposure to ionizing radiation. *See* § 42-11-70 ("Neither an employee nor his dependents shall be entitled to compensation for disability or

---

[3] Interestingly, the circuit court repeatedly referred to section 42-11-70 as a statute of repose in its written order, although it ultimately determined it did not bar recovery for occupational disease claims.

death from an occupational disease, *except that due to exposure to ionizing radiation*, unless such disease was within one year after the last exposure to the hazard peculiar to his employment which caused the disease . . . ." (emphasis added)).  Pursuant to the rules of statutory construction, "[w]here there is an express exception in a statute, all other exceptions which are not expressly set forth are e[x]cluded." *Vernon*, 244 S.C. at 157, 135 S.E.2d at 844.  Here, the legislature carved out one exception to the time limitation between exposure and contraction for diseases caused by exposure to ionizing radiation.  That they chose not to do so for pulmonary diseases evinces the legislature's intent to preclude compensation in such cases unless the disablement or death occurs within two years from the last exposure.  *See id.* ("The inclusion of one exception amounts to an affirmation of the applicability of the statute's provision to all other cases which are not excepted.").[4]

---

[4] Although not binding authority, we find it persuasive that the Appellate Panel of the Commission has interpreted section 42-11-70 similarly in other cases.  *Media Gen. Commc'ns, Inc. v. S.C. Dep't of Revenue*, 388 S.C. 138, 149, 694 S.E.2d 525, 530 (2010) ("An agency's long-standing interpretation of a statute is usually entitled to be given deference and should not be overruled by a reviewing court in the absence of cogent reasons . . . ."); *see also, e.g.*, *Bethea v. City of Myrtle Beach*, No. 1802724, 2019 WL 7424840, at *12 (S.C. Work. Comp. Comm. June 13, 2019) (denying benefits because the medical evidence showed Bethea did not contract lung cancer within two years of his last exposure to the hazards peculiar to his employment); *Truax v. Daniel Constr.*, No. 0411701, 2009 WL 1433538, at *3 (S.C. Work. Comp. Comm. Mar. 27, 2009) (denying compensation for asbestosis when there was a thirty-two year gap between Truax's last exposure and the date he became disabled because section 42-11-70 "is abundantly clear in its intent to disallow compensation for disability or death for an occupational disease of a pulmonary nature that is not contracted within two years of the date of the last injurious exposure"); *Bishop v. Westinghouse Elec. Corp.*, No. 0318085, 2007 WL 904837, at *9 (S.C. Work. Comp. Comm. Jan. 26, 2007) ("The language references two distinct events: (1) exposure and (2) contracting the occupational disease.  Since exposure and contracting the disease are distinct, and not the same, an ordinary and unambiguous meaning should be assigned to the word contracting, i.e.[,] when the disease manifests itself and/or disables the claimant.  The legislature chose to make compensability dependent on [there] being less than one (or two) year(s) between exposure and contraction of the disease."); *Gibson v. Westinghouse Elec. Corp.*, No. 0319071, 2007 WL 869985, at *8 (S.C. Work. Comp. Comm. Jan. 24, 2007) ("The Appellate Review Panel finds that the purpose of [section] 42-11-70 is to protect the employer against claims too old to be fairly

We recognize that this holding may "impose on some plaintiffs the hardship of having a claim extinguished before it is discovered, or perhaps before it even exists." *Capco*, 368 S.C. at 142, 628 S.E.2d at 41 (quoting *Camacho v. Todd and Leiser Homes*, 706 N.W.2d 49, 54 n.6 (Minn. 2005)). However, to hold otherwise "would upset the economic balance struck by the legislative body." *Id.* "Under the plain meaning rule, it is not the court's place to change the meaning of a clear and unambiguous statute." *Hodges*, 341 S.C. at 85, 533 S.E.2d at 581. Accordingly, we agree with WestPoint that the time period for any new claims has run because the two-year exposure period expired on August 8, 2007. We therefore reverse the circuit court's finding that the Commission could continue to hold WestPoint's funds and hold WestPoint is entitled to the return of its initial deposit plus any interest the funds have earned in the Treasury account up to the date the Commission returns the money.

**Prejudgment Interest**

WestPoint argues that it is statutorily entitled to prejudgment interest; the Commission asserts sovereign immunity bars the recovery of prejudgment interest. However, because the circuit court found against WestPoint regarding the propriety of the Commission's drawdown of the letter of credit and determined the Commission was entitled to retain those funds, it did not rule on WestPoint's request for prejudgment interest. Accordingly, we remand this issue to the circuit

---

investigated and defended. Accordingly[,] this statute should be read to effectuate the legislative intent to reasonably limit an employer's period of potential liability for workers' compensation benefits."); *Rumsey v. Daniel Int'l. Corp.*, No. 0011205, 2003 WL 22380606, at *10 (S.C. Work. Comp. Comm. Feb. 12, 2003) ("'[C]ontracted' cannot mean when the disease is 'definitively diagnosed' because that definition would render meaningless the distinction between [section] 42-11-70 and the statute of limitations provision in [section] 42-15-40, such that the time for filing a claim under [section] 42-15-40 would immediately begin to run in *every* situation upon the instant the disease was 'contracted' under [section] 42-11-70 . . . ."). *But see Bowers v. Sea Island Staffing*, No. 0226915, 2009 WL 1425599, at *4-5 (S.C. Work. Comp. Comm. Feb. 26, 2009) (awarding compensation to claimant who retired in 1994 and was diagnosed with asbestosis in 2002, after "an exposure in the 1980's or 1970's"); *Powell v. Yeargin Constr. Co.*, No. 0617676, 2008 WL 5066354, at *2 (S.C. Work. Comp. Comm. Oct. 29, 2008) (awarding total disability to employee who was diagnosed with mesothelioma in 2006 and whose last exposure occurred in 1983).

court for consideration of each party's arguments. *See TransSouth Fin. Corp. v. Cochran*, 324 S.C. 290, 297, 478 S.E.2d 63, 66-67 (Ct. App. 1996) (declining to enter judgment in favor of appellant and remanding for "an additional evidentiary hearing to determine the amount of the judgment," because although the principal amount was undisputed, the respondent challenged the judgment rate of interest). In the event the circuit court finds WestPoint is entitled to prejudgment interest, the amount to be awarded should take into consideration the interest already returned to WestPoint along with its initial deposit to prevent double recovery. *See Gipson v. Coffey & McKenzie, P.A.*, 445 S.C. 395, 399, 914 S.E.2d 842, 844 (2025) ("The law's refusal to allow a double recovery is fundamental . . . . A trial judge may invoke this basic common law rule to ensure the verdict amount comports with the plaintiff's actual loss." (citations omitted)); *The Winthrop Univ. Trs. for the State v. Pickens Roofing & Sheet Metals, Inc.*, 418 S.C. 142, 168, 791 S.E.2d 152, 166 (Ct. App. 2016) ("It is a fundamental rule of law in this state that there can be no double recovery for a single wrong." (quoting *Inman v. Imperial Chrysler-Plymouth, Inc.*, 303 S.C. 10, 13, 397 S.E.2d 774, 776 (Ct. App. 1990))); *see also First S. Bank v. Fifth Third Bank NA*, 631 F. App'x 121, 126 (4th Cir. 2015) (per curiam) (holding that because the parties stipulated to an amount owed that included prejudgment interest, "any award of additional prejudgment interest would amount to a windfall").

**CONCLUSION**

The order of the circuit court is therefore **REVERSED**, and this matter is **REMANDED** to the circuit court for further proceedings consistent with this opinion.

**WILLIAMS, C.J., and GEATHERS, J., concur**.